Beauregard F. **BIRDWELL**, Appellant,

v.

**HAZELWOOD SCHOOL DISTRICT** et al.,
Appellees.

No. 73–1034.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 11, 1973.

Decided Feb. 5, 1974.

As Amended on Denial of Rehearing and
Rehearing En Banc March 6, 1974.

Daniel T. Rabbitt, St. Louis, Mo., for appellant.

Richard O. Funsch, St. Louis, Mo., for appellees.

Before GIBSON and BRIGHT, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

TALBOT SMITH, Senior District Judge.

The appellant, a former teacher employed by the Hazelwood School District, St. Louis County, Missouri, instituted this action against the Board of Education of the School District,[1] the members of the Board individually, and three administrative officers of the Hazelwood School District. Violations of 42 U.S.C. §§ 1981 and 1983 were alleged, with jurisdiction based on 28 U.S.C. § 1343(3) and (4). The complaint sought reinstatement, back pay, injunctive relief, and, in the alternative, money damages for loss of reputation and breach of contract in the amount of $100,000 for the alleged violations of appellant's constitutional rights of free speech and due process of law, and for violation of R.S. Mo. § 168.126 (1969), V.A.M.S., requiring a written statement of charges and ninety days' notice before termination. A trial to the court, Judge Wangelin, held for the appellees. Birdwell v. Hazelwood School District, 352 F.Supp. 613 (E.D.Mo.1972). We affirm.

---

* Hon. Talbot Smith, United States Senior District Judge, Eastern District of Michigan, sitting by designation.

1. By amendment the Hazelwood School District was substituted as a party defendant in place of the Board of Education.

The opinion in the District Court set forth the facts in detail. We here summarize only those relevant to the issues raised. The appellant was a probationary teacher. Prior to the incidents giving rise to the charges here made he had objected to the presence of the R.O.T.C. at the school, expressing the view that they had "no right to be on the campus." It was his position that the students and faculty should decide who should visit the campus, but his arguments were rejected by the principal, Mr. Fuqua, who informed appellant that he, the principal, was the agent of the Board of Education in the matter and that it was his responsibility, not the appellant's, to make such determinations. The appellant at this time was a probationary teacher and not in a policy-making position in the school hierarchy.

On May 19, 1971, it was announced over the public address system that United States Army personnel would be in the building and students were invited to speak with them. This announcement was made at the beginning of a class period during which appellant was conducting a class in Algebra II for students of all three years. A general class discussion of the visit by military personnel ensued. Appellant indicated that before such visitors were invited onto the campus there should be a consensus of faculty and students in favor of the visit. He became emotionally upset as he continued the discussion, although the trial court found that he "retained some control over his emotional state." One of the students testified that appellant observed to the class that the students at Hazelwood were "4000 strong," that they could get the military off the campus, and that at Washington University the students would not tolerate the military coming onto the campus. This reference was taken by student Stephens to pertain to an incident where "at this time last year Washington University had just burned down their R.O.T.C. building." There was no suggestion that the students actually remove the recruiters physically, but reference to the use of force against them was made. It happened to be on this date that a student organization distributed apples to the faculty members to show their appreciation of their work. Several students testified that appellant suggested that the students could throw their apples at the recruiters. "[H]e was serious, he meant it" testified one of the students. And, also, "to get them in a crowd, and push them and kick them, make them feel like they weren't wanted." This latter was accomplished in part during the recess period when many students were in the hall. Appellant approached Sergeant Smith, who, with his two companions, were standing near their table in their khaki uniforms. Appellant pointed his finger at the Sergeant and said in a loud voice "On behalf of myself and other faculty members and the students, we don't want you here. We are getting together a petition to have a restraining order having you restrained from the school." Sergeant Smith made no comment in reply, simply acknowledging the greeting. The servicemen were there with permission for the purpose of discussing with students a military career. They brought with them no firearms, but literature. "We were strictly in the hall with a table of literature, strictly providing information to those who requested it," testified the sergeant. We are constrained to observe at this juncture that the appellant's zealous advocacy in our court of his constitutional right of free speech contrasts sharply with his obvious intolerance of the exercise of such speech by others with whose views he disagrees.

The incident was reported to the Principal Fuqua by Mr. Henner, the assistant principal, who requested that appellant meet with him that day, but appellant did not respond. The next day, following a complaint from one of the parents, appellant was requested to, and did, meet with the school's administrative officials to discuss the incident. At this meeting, the District Court found, appellant admitted confronting the soldiers in the hall as well as making the

statement to his class that the student body was some 4000 strong and that at Washington University the presence of the military visitors would not be tolerated by the students. Mr. Huss, Hazelwood Co-ordinator of Secondary Education, thereupon advised appellant that he was suspended from his classroom duties until the matter was resolved.

A report was made to Dr. McDonald, Superintendent of Education for the Hazelwood School District. It was the recommendation of Mr. Huss, according to the oral testimony of Dr. McDonald, that appellant should be dismissed because a) he was inciting the students to disruptive processes, and b) he was interrupting the educational process. Dr. McDonald confirmed the suspension, instructed Huss to notify appellant that the Board would meet that night, and to inform the appellant that he was invited to appear and speak. Huss so advised appellant of the Board meeting, that his dismissal would be recommended, and that he was invited to attend. Appellant did not do so, upon advice of counsel, and the Board, after consideration, unanimously voted to terminate his employment.

■■ Before this court the appellant argues that he was dismissed for constitutionally impermissible reasons, namely, "because he informed his students of his opposition to the campus visitation by military recruiters in violation of his right of free speech as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States." The right of free speech, thus, asserted, is not, of course, an absolute right. Schenk v. United States, 249 U. S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). We must weigh the interests asserted by the state officials against the infringement of the protected rights of the

individual.[2] Particularly demanding is this process in the educational field where freedom of expression is peculiarly appropriate, since the classroom is peculiarly the "market place of ideas."[3] In the situation presented we must "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public service it performs through its employees."[4]

■ The controlling law in this area, as we noted in Gieringer v. Center School Dist. No. 58, 477 F.2d 1164 (8th Cir. 1973), is found in Pickering, supra, note 2. It was there held (1) that a teacher retains the right as a citizen to comment on matters of public concern; (2) that to the degree such commentary is substantially accurate, it provides no grounds for dismissal absent a showing of disruption of the teacher's classroom duties or the regular operation of the school, and (3) that, even if the commentary is inaccurate, a showing of disruption is still required unless it can be proved that the statements in question were knowingly or recklessly made.

The District Court found that the appellant's statements, both in class and in the hallway, interfered with the educational process. The statements were completely irrelevant to appellant's duties of teaching mathematics and diverted the time and attention of both students and teacher from the prescribed curriculum. They embodied, as well, an attempt to defeat a school policy by improper means. But, beyond matters of school policy and curriculum, it was found that appellant's statements were "infused with the spirit of violent action" to the degree that the school au-

2. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

3. Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). The cases are collected in Emerson, The System of Freedom of Expression, "Academic Freedom," 593, 598–611 (1970). See

also Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); "Developments in the Law, Academic Freedom," 81 Harv.L. Rev. 1045 (1968).

4. Pickering v. Board of Education, 391 U.S. at 568, 88 S.Ct. at 1734.

thorities found a situation of potential disruption.[5]

The findings thus made we do not disturb, absent such clear error as to leave us, on the entire evidence, with the definite and firm conviction that a mistake has been committed.[6] We note, as well, that this rule applies also to factual inferences from undisputed facts. Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); St. Louis Typographical Union No. 8 v. Herald Company, 402 F.2d 553, 557 (8th Cir. 1968). So examined, the conduct of the appellant comes squarely within the proscriptions of *Pickering, supra,* note 2.

But appellant urges to us that Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), warrants his exculpation on the ground that there must be actual disruption before the authorities may act. It is argued that "there was no material or substantial disruption of the school" and that, in fact, the only tangible result of appellant's statements was the circulation of a petition by one of the students supporting appellant's views. *Tinker,* however, is inapposite. It involved only the silent wearing of armbands, a situation not analogous to a thinly veiled exhortation to violence. Moreover, *Tinker* itself distinguishes the conduct we here consider.[7] *See also* Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969), cert. denied, 398 U.S.

965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970).[8] In a situation of potential disruption there is no requirement in the law that the proper authorities must wait for the blow to fall before taking remedial measures.

Moreover, even should violence not have occurred, we do not take it that such is a *sine qua non* of disruptive conduct. The trial court found that the appellant's actions, both in the classroom and in the hallway, were "disruptions of the orderly and disciplined operation of the school in and of themselves." It is clear upon this record that appellant's termination did not result from the exercise of a constitutionally protected right of free speech.

Appellant also argues that he was denied due process as to the Board's hearing. He asserts that he must be given a reasonable opportunity to be heard and to be advised of the identity of witnesses against him, as well as other procedural rights. He complains that the hearing was held "behind closed doors" and that neither the Army personnel nor students were present to testify. We need not catalog the numerous offenses to due process claimed by appellant after the event. He is in no position before us to complain of these alleged deficiencies. He was aware of the time and the place of the Board meeting, that his continued employment was at stake, and that his dismissal was being recommended because of his statements in class and his actions towards the

---

5. Mr. Huss, a teacher of some twenty years' experience, regarded the situation following the incident as grave. The school was the largest in the state, overcrowded, and had had past problems with a student organization (SDS) seeking to "disrupt the educational process." It was his testimony that because of the "quick action" taken there had been no disruption, that "we headed it off." Continuing he explained in these terms: "You asked me or somebody asked me a while ago about my opinion on dealing with this type of kids and I know the longer they get the chance to talk about it and the fact that no action is taken, there might be something happen, and I think in my best judgment the action we took may have prevented any demonstrations or any severe action."

6. Fed.R.Civ.P. 52; Barryhill v. United States, 300 F.2d 690 (8th Cir. 1962).

7. "As we·have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred." *Tinker,* 393 U.S. at 514, 89 S.Ct. at 740.

8. "That emphasis [in the majority opinion in *Tinker*] is on the absence of 'actually or potentially disruptive conduct' by the participants * * *." *Esteban,* 415 F.2d at 1087.

servicemen in the building. Nevertheless, with this knowledge, and after conferring with legal counsel, it was his decision not to attend the meeting.

The "standards of procedural due process are not wooden absolutes." [9] The sufficiency of the procedures must be judged in the light of the totality of the circumstances. The fundamental requirement of due process "is the opportunity to be heard, 'at a meaningful time and in a meaningful manner,' * * * This opportunity must be 'appropriate to the nature of the case.' * * * 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " [10]

The opportunity thus demanded was here afforded but appellant deliberately chose not to avail himself of it and not to present to the Board the arguments made to us. He cannot now scour the record of the hearing he thus ignored for flaws in its conduct. We find a voluntary and knowing waiver. Johnson v. Zerbst, 304 U.S. 458, 58 S.C. 1019, 82 L. Ed. 1461 (1938).

It is also the urging of the appellant that, being a probationary teacher, his discharge was governed by the provisions of R.S.Mo. § 168.126, subd. 2 (1969), V.A.M.S.,[11] stating that a board of education "may terminate the employment of the probationary teacher" for incompetency. From this the appellant apparently argues that there is no further authority, express or implied, in the Board to dismiss for any other cause and thus, not having been discharged for incompetency, his discharge was in violation of his contractual rights. For this he seeks monetary damages. These claims, asserted under the statutes of the State of Missouri, arose from the same incident as did the federal claims heretofore considered. In view of the interrelation of the claims under the circumstances of this case the District Court properly concluded that it had pendent jurisdiction over such state claim. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The District Court rejected the argument made, pointing out that such construction of the act would vest in a probationary teacher far greater security than that afforded a permanent teacher,[12] obviously not the intent of the act. In addition the court found, after exhaustive analysis of the applicable statutes of the State of Missouri, and the judicial interpretations thereof, ranging from McCutchen v. Windsor, 55 Mo. 149 (1874), Arnold v. School District, 78 Mo. 226 (1883), Magenheim v. Board of Education, 347 S.W.2d 409 (St.

---

9. Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir. 1970).

10. Ahern v. Bd. of Education, 456 F.2d at 403.

11. "Probationary teachers, how terminated —reemployed, how.

   If in the opinion of the board of education any probationary teacher has been doing unsatisfactory work, the board of education through its authorized administrative representative, shall provide the teacher with a written statement definitely setting forth his alleged incompetency and specifying the nature thereof, in order to furnish the teacher an opportunity to correct his fault and overcome his incompetency. If improvement satisfactory to the board of education has not been made within ninety days of the receipt of the notification, the board of education may terminate the employment of the probationary teacher immediately or at the end of the school year."

12. R.S.Mo. § 168.106 (1969), V.A.M.S., provides: "Indefinite contract, what affects

   The contract between a school district and a permanent teacher shall be known as an indefinite contract and shall continue in effect for an indefinite period, subject only to:

   (1) Compulsory or optional retirement when the teacher reaches the age of retirement provided by law, or regulation established by the local board of education;

   (2) Modification by a succeeding indefinite contract or contracts in the manner hereinafter provided;

   (3) The death of the teacher;

   (4) Resignation of the teacher with the written consent of the school board;

   (5) Termination by the board of education after a hearing as hereinafter provided; and

   (6) The revocation of the teacher's certificate."

Louis C.A.1961), to Williams v. Longtown School District No. 71, 468 S.W.2d 673 (St. Louis C.A.1971), that, whatever the Missouri law may have been prior to the passage of the Teacher Tenure Act,[13] it is now clear from a comparison of the requirements of § 168.116, subd. 1 [14] relating to the termination of permanent teachers, with those of § 168.-126, subd. 2, *supra*, note 12, relating to the termination of probationary teachers, that it was the legislative intent to grant the Board implied authority to act as it did in the circumstances here presented. We concur in the interpretation made. The conduct of this probationary teacher in utilizing his algebra class as a forum from which to suggest, none too subtly, to young and immature minds, that they employ measures of violence as a demonstrative device, presented a grave situation, with respect to which the Board was well authorized to exercise its implied authority.

We find no error in the proceedings below. The judgment is affirmed.

13. R.S.Mo. §§ 168.102–168.130 (1969), V.A.M.S., effective July 1, 1970; R.S.Mo. § 168.-102 (1969), V.A.M.S.

14. "Termination by board—notice—charges
1. The indefinite contract of a permanent teacher may not be terminated by the board of education until after service upon the teacher of written charges specifying with particularity the grounds alleged to exist for termination of such contract, notice of a hearing on charges and a hearing by the board of education on charges if requested by the teacher."