**Thomas A. FERN, Plaintiff-Appellee,**

v.

**THORP PUBLIC SCHOOL et al.,
Defendants-Appellants.**

**No. 75–1895.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1976.

Decided April 1, 1976.

Rehearing and Rehearing En Banc
Denied June 10, 1976.

Griffin G. Dorschel, Eugene O. Gehl, Madison, Wis., for defendants-appellants.

Gregory A. Wilson, Wis. Ed. Ass'n Council, Madison, Wis., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and STECKLER, District Judge.[*]

PELL, Circuit Judge.

This is an appeal from an order of the district court denying the defendants' motion to vacate a preliminary injunction, the effect of which was to restore the plaintiff to his position as a teacher in the Thorp School District in Wisconsin.

No testimony, either in court or by way of deposition, has been taken thus far in the case; but upon the basis of the verified complaint and affidavits submitted by the parties, the following appears to be fairly established. Thomas A. Fern, the plaintiff, began working in the defendant school district as a teacher with the 1968–69 school year and continued such employment until his induction in the United States Army in January, 1972. Among other duties assigned to him in that branch of the military service, Fern was engaged in providing instructions to new inductees. In connection with his duties, he formulated and distributed to new inductees, male and female, ages ranging from 17 to 40, copies of a survey entitled "Human Sexual Awareness Inventory" (hereinafter HSAI).

Upon his honorable discharge, Fern resumed his teaching position at Thorp in January, 1975. The district court found, and we have no basis for challenging such finding, that but for his discharge in May, 1975, Fern would have been entitled under the laws of Wisconsin to continue employment as a teacher during the 1975–76 school

[*] Chief Judge William E. Steckler of the Southern District of Indiana is sitting by designation.

year. Upon the resumption of teaching in January, 1975, the plaintiff was assigned a class in "Contemporary Living" in which the students were high school seniors whose ages ranged from 16 to 19. There is no indication as to whether any supervising authority had designated the content of the course or what textual materials, if any, should be used by the instructor. Fern divided the students in the course into three groups and each group was given the opportunity to select a topic it wished first to discuss. One group, consisting of six students, selected the topic "Sex and the New Morality." The record does not indicate whether this was one of several topics made available to the students by Fern or whether the designation was that of the students. Shortly after the selection, Fern distributed copies of HSAI to the group. According to the plaintiff's affidavit the group "requested that your affiant distribute to them copies of [HSAI] that he had distributed while in the military." We can only assume that the students in making the request had been apprised of the document by Fern. Further, according to the affidavit, "the survey was utilized solely to apprise said students of their knowledge or lack thereof in the area of sex education; that said survey played no role in deciding upon the grades the students in Group 1 would receive; that said survey was distributed anonymously and was voluntary and, in fact, was not collected."[1] We do not understand the reference to the anonymous distribution since it must have been apparent to the students that Fern was the source of the material.

The HSAI was in several parts with lines for answers to be inserted as called for in response to the particular material. On the copies appended to the complaint and to plaintiff's affidavit, these answers were filled in, and it would appear to be a fair inference that the material was in that form when distributed to the students. The first part of the material contained line drawings of the lower part of the human anatomies of a male and female and this part called for matching the some fifteen numbered portions of the sexual apparatus with the proper identifying terms.[2] Part two required matching "Socio-Biological" terms with the corresponding "Street Term" of each. Whether any of the so-called street terms were unfamiliar to the students does not appear in the record. The third part of the material consisted of forty true-false questions. In this part, some of the questions as answered on the exhibits as they appear in the record no doubt precipitated the consternation and indignation which eventually developed among the parents and taxpayers in this school district. Thus, although some of the answers merely served to dispel old wives tales, irrespective of societal statistics showing that many high school students are no longer utter strangers to the sexual experience, it is not surprising that a substantial number of parents would be alarmed and become belligerent by reading in material distributed to their children by a teacher that it was false that virginity of the woman is an important factor in determining the success of a marriage. Other answers, while understandably correct if delivered to persons of some sophistication, might appear to support an inference to less urbane persons of approval of what is still regarded in many communities as socially unacceptable deviate practices.

The final part of the material contained twenty statements which were supposed to represent personal opinions. Each statement was followed by numbers 1 through 5 which were to be circled to reflect the following opinions respectively: "Strongly Disagree," "Moderately Disagree," "Neutral," "Moderately Agree," and "Strongly Agree." In each instance on the exhibits in the record one number had been circled;

1. It appears that the sole use of the material was in the sense of information dissemination and not for any sort of sociological study based upon data secured by a return of the material to the teacher.

2. Part one of the material would appear to be nothing more than that which would appear in standard, presumably readily available, reference works on human anatomy.

however, in the margin of this portion only, there was the following caveat: "Circled Responses are the most liberal viewpoints. No answers are right or wrong!" Irrespective of whether the teacher was intending to indicate any personal viewpoint to the students, the markings indicated strong agreement with the following statements:

"1. Any sexual act between two consenting adults, of opposite sex in privacy is alright.

"6. Promiscuous sexual relations (engaging in sexual relations without any legal or emotional commitment to the other individual) is alright.

"7. Homosexuality should be legalized.

"10. Prostitution should be legalized.

"13. Engaging in sexual relations with more than one person at a time (group sex) is alright.

"15. The exchanging of marital partners for the purpose of sexual intercourse (Wife/Husband swapping) is alright."

Strong disagreement was registered for the statement that premarital intercourse is wrong.

Approximately two weeks after the initial distribution, upon the choosing of new topics by the three groups, the students in Group 3, originally having been nine in number, selected "Sex and the New Morality," and the HSAI was distributed to the members of the group. One day later, February 20, 1975, at a conference with the district administrator and the school principal, plaintiff was informed of their disapproval of the distributed material. It was agreed that the HSAI would not be used again and that Fern was to submit a detailed lesson plan describing the topics which would be discussed in the course during the remainder of the school year, which submission was made promptly with some changes being agreed upon by the three individuals.

During the period of February 28 through March 5, the parents of 31 students withdrew their children from Fern's classes. On March 3, 1975, the district administrator advised the plaintiff that the district administrator had been directed to provide parents of students with copies of the HSAI. The record does not disclose whether the reason for this action arose from the disinclination on the part of the students to share the material voluntarily with their parents. At the same time, the district administrator instructed the plaintiff to discontinue teaching the topic "Sex and the New Morality," with which plaintiff agreed. There was also a meeting that day between Fern, the district administrator, and some parents.

Strong adverse reaction to the use of the material continued to mount on the part of parents. A special meeting of the school board was held on March 4 at which about 325 adults were present, which was an unusually large attendance for such a meeting and required removal of the meeting from the high school to the gymnasium of the elementary school. The discussion concerning Fern's material was lengthy and heated. Demands were made for his discharge. During the meeting two threats were made against Fern, being that he could be gotten with a bullet and that he would be bodily removed from the high school if he continued being there. Also the view was expressed that parents would remove their children from his classes if he remained as a teacher. A woman who indicated that she was a spokesman for many in attendance articulated, according to the school board minutes, six reasons supporting the demand for discharge, including that Fern was engaging in a course of instruction beyond the scope of his employment, submitting to students of both sexes material designed for military personnel, infiltrating the students' minds with gutter language not in keeping with local standards, and impairing morality by undermining parental guidance and direction.

On the following morning a telephone call was made to the high school office stating that plaintiff would be physically removed from the school at noon. On the same morning the local police received a telephone call to the effect that the department did not have sufficient men to pre-

vent the plaintiff's removal from the school. Plaintiff was instructed by the district administrator to leave the school and return to his home which he did. On the same day Fern wrote the district administrator that he was aware that the school board was meeting that evening to consider what course of action, if any, should be taken in response to statements made at the board meeting on the previous evening. The letter continued that if the board determined that a clear and present danger "exists to the health and safety of students, faculty and myself because of events now occurring in the community," he should be temporarily relieved with pay of all duties until March 11, 1975.[3] The letter indicated that the proposal was in no way to be construed as a belief on the part of the writer that he was guilty of any wrongdoing in the matter and that if there were any questions concerning the matter contact should be made with his representative[4] at Wausau, Wisconsin. At its executive session that evening, the school board unanimously relieved Fern of all duties, with pay, "as it appeared there is a clear and present danger to the health and safety of Mr. Fern and possible danger to others." This situation was to continue in effect until the board made a final decision.

By a letter dated April 11, 1975, plaintiff was notified by the board that he was temporarily relieved of his duties for the balance of the 1974–75 contract without base and fringe benefit pay (exclusive of fringe benefit hospitalization insurance premiums) until his matter had been resolved. The letter also informed Fern that if reinstatement would result with an order for back pay, the same would be provided. The plaintiff was also notified by the letter that his discharge was to be considered, and a procedure was outlined whereby he could, upon request, obtain a statement of the reasons for the board's consideration of possible discharge and have a hearing by an independent hearing officer on the question of discharge. The procedures for the hearing were to be established by the hearing officer and admissibility of evidence offered by the board and the teacher would be governed by the provisions of the Administrative Procedure and Review statute of Wisconsin, Section 227.10. The hearing would be closed unless Fern requested an open hearing. The hearing officer would be required to submit in writing to the board and Fern his recommended findings of fact and recommended decision based on the hearing record. It is to be noted at this point that at all material times in this litigation, Fern has been represented by counsel whose address is given as the Wisconsin Education Association Council. The copy of the HSAI attached to plaintiff's complaint and affidavit reflects a file mark reading "Received Mar 10 1975 WEAC Legal." A copy of the board letter of April 11 similarly attached to the complaint and affidavit reflects: "Received Apr 14 1975 WEAC Legal." The plaintiff made no request for a statement of reasons or for a hearing within the ten-day period provided for in the April 11 letter.

On May 9, 1975, the plaintiff received a notice dated May 6 from the board which stated that the board had found that "the presentation and use of the survey 'Human Sexual Awareness Inventory' has caused and will continue to cause disruption and impairment of school discipline and significant danger of harm to the students, school employees and yourself." The plaintiff was further notified that he was discharged from employment for the balance of the 1974–75 contract year, commencing from receipt of the notice.

The complaint and motion for preliminary injunction were filed on May 12, 1975. A non-evidentiary hearing on the motion was held on June 17, 1975. The district court's opinion and order were issued two days later enjoining the defendants from

---

3. At the March 4 meeting there had been a decision recorded to have an executive board meeting on March 11. The record does not disclose whether this meeting occurred in fact and if it did what transpired at the meeting.

4. The representative was identified elsewhere in the record as the area representative of the Wisconsin Education Association.

giving any further effect to the decision of May 6, 1975.

In his motion for a preliminary injunction, Fern claimed entitlement to be free from any act "which would tend to interfere with, coerce or restrain the Plaintiff Thomas A. Fern, in the exercise of his Constitutional right to speak freely." The principal thrust of his supporting affidavit was that the action taken against him "tends to chill and impede his free exercise of expression." The district court in its opinion, however, was not persuaded that the plaintiff's chance for ultimate success on his First Amendment academic freedom contention was sufficiently good to support a preliminary injunction. Deferring for the moment a detailed analysis of the balance of the district court's opinion, it suffices at the present point only to note that the preliminary injunction was granted on the basis that there was indicated a sufficient likelihood of Fern ultimately prevailing to justify the injunction, despite the disruption occasioned by his conduct, under the circumstances here found by the court, "when the teacher has had no advance warning that the conduct was impermissible and when the conduct was not of such a nature that its impermissibility should have been clear to the teacher even in the absence of a warning." This was based upon the claim of a violation of due process under the Fourteenth Amendment. Although not so characterized in the district court's opinion, it appears that the court contemplated a violation of substantive rather than procedural due process rights.

The court also stated that the order was being entered without prejudice to a motion by the defendants to vacate or modify it. In such an event a hearing would be promptly granted, at which the court "would expect defendants to concentrate on an attempt to show that plaintiff's presence in the school as a teacher in 1975–76 can reasonably be expected to produce significant disruption of the school's function."

Whether because of this implied invitation, because of school being in a vacation period, or because of other factors presuma-

bly satisfactory to the defendants, an appeal was not taken from the granting of the injunction. Instead, on August 12, 1975, the defendants moved to vacate the preliminary injunction "on the ground that the plaintiff's presence in the Thorp Public School as a teacher in 1975–76 can be expected to produce significant disruption of the school's function." Three supporting affidavits accompanied by numerous documentary exhibits were filed on behalf of the defendants, those being the affidavits of the attorney for the defendants, the chief of the police, and the district school administrator. As summarized by the plaintiff in his brief in this court, the affidavits "arguably tended to show that should Fern be allowed to remain in the school, certain parents would initiate picketing; Fern's continued presence in school will necessitate the presence of police in the school; Fern will be harassed; Fern will be threatened; and that Fern will be the victim of certain acts of violence by certain members of the Thorp community."

In fact, the affidavits were significantly more specific and factual. In the case of the district administrator's affidavit after reciting facts concerning the greatly increased attendance of taxpayers at board meetings, the letters from parents threatening withdrawal, the arrangements for the presence of police, and the continued objections of the community as specifically manifested, the affidavit projected the reasonably expectable situation during the coming school year as follows:

"a) Thomas Fern will be harassed on his drive to and from Chippewa Falls, such harassment manifesting itself in the form of attempts to run Fern off the road;

b) Fern will receive threatening phone calls and letters;

c) More parents will demand, by means of letters, calls or personal visits, the withdrawal of their children from his classes;

d) The parents will demand an immediate meeting with the Board;

e) Teachers will become upset over the adding of additional classes to accommodate parents' demands and they will insist that the administration take a more hardnosed attitude toward such requests;

f) The teachers will demand a meeting with the Board;

g) Demands will be placed on the administration concerning course requirements and parents will demand that the Board and administration know what is going on in the classroom at all times;

h) Teachers will become concerned about their physical safety;

i) The cumulative effect of these actions and concerns will be to disrupt the educational process in Thorp."

While prophesying in the area of human relationships necessarily has elements of conjecture, the predictions of the administrator were based upon a history which the record fairly indicates to be a continuing one. Thus, in the matter of teacher disruption, the record elsewhere indicates a fragmentation in the teacher staff. The local education association had not held a meeting to vote support for Fern and some faculty members had withdrawn instructional materials that might be controversial.

The following factual assertions appear in the affidavit of the district administrator, which material had not been contained in previous affidavits:

"3) That Thomas Fern, plaintiff in this action, began working in the district starting with the academic year 1968–69; that Fern was continuously employed by the district until January of 1972 when he joined the army; that prior to his departure there had been complaints by parents about Fern's teaching methods and he was called before the Board to discuss these complaints; that prior to Fern's

discharge from the Army he met in September or October of 1974 with your affiant and Floyd Hanley, principal of the high school, concerning re-employment with the district upon discharge; that in view of previous difficulties your affiant and Hanley discussed his earlier problems and indicated that any controversial material should be checked with the principal of the high school before being used in the classroom; that Fern resumed his employment with the district on or about January 6, 1975."

The affidavits in support of the motion to vacate were filed on August 12 and 15. No counter affidavits were filed on behalf of the plaintiff. Argument was heard on the motion to vacate on August 15 and the judge from the bench ruled that the motion would be denied. This appeal followed.

The initial question for resolution on this appeal is the scope of our review. The notice of appeal referred only to the denial of the motion to vacate the preliminary injunction and, of course, the time for an appeal from the granting of the preliminary injunction had expired. This court does have apparent jurisdiction of the appeal pursuant to 28 U.S.C. § 1292(a)(1) which grants jurisdiction over appeals from interlocutory orders including district court action in refusing to dissolve injunctions. The question remaining, however, is whether the scope of the present review is sufficiently broad for an examination of the propriety of granting of the preliminary injunction since no appeal was taken at the time that was granted.

The defendants in their original brief in this court advanced various reasons in support of the impropriety of the granting of the injunction. In his answer brief, the argument portion of which was only 2½ pages in length, the plaintiff contends that the propriety of the issuance of the injunction is not before this court.[5] We are un-

---

**5.** In his motion for extension of time in which to file his answer brief, the plaintiff asserted in the supporting affidavit of his counsel that "the matter involved in the appeal presents complex issues of facts and law and deals with the First and Fourteenth Amendments as they relate to a

local school system and the discharge of plaintiff appellee as a teacher because of the community reaction created by plaintiff appellee's teaching of a course entitled 'Sexual Awareness Inventory' [sic]."

aware of any case authority directly in point as the jurisdictional issue is presented in the present appeal. The only case cited by the plaintiff to support his position is *Securities and Exchange Commission v. Thermodynamics, Inc.*, 464 F.2d 457 (10th Cir. 1972), *cert. denied*, 410 U.S. 927, 93 S.Ct. 1358, 35 L.Ed.2d 588 (1973). That case, according to the plaintiff, stands for the proposition that where there is an appeal from a district court's refusal to vacate an injunction, the court of appeals will not overturn such a decision absent a finding that the district court abused its discretion in refusing to vacate the injunction. It might seem there could be no quarrel with the proposition thus stated. The question here is whether this court in reviewing the district court's exercise of discretion can look beyond the immediate action taken in refusing to vacate the preliminary injunction to determine whether the injunction should not have been granted in the first place; or stating it another way, if the district court improperly granted a preliminary injunction, does the court abuse its discretion by not vacating it upon proper request if it should not have been granted originally. *Thermodynamics* helps the plaintiff very little because in that case the injunction entered in 1965 was pursuant to a consent decree and the principal issue before the court was whether the change of conditions was sufficient to require a vacation. Actually the case may lend some support to the defendants as the reviewing court as an initial matter did consider the appellant's contention that the trial court had no jurisdiction to enter the injunction. The court of appeals determined that there was jurisdiction and therefore that the "injunction was and is valid." 464 F.2d at 459. The plaintiff in the present case cites no cases for his twice-asserted contention that the issues relative to the issuance of the injunction are not before this court.

In their reply brief, defendants cite several cases, some of which may be helpful to them by way of analogy but do not appear to grapple squarely with the issue before us. In *Mills v. Electric Autolite Company*, 403 F.2d 429 (7th Cir. 1968), *vacated and remanded on other grounds,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), there was an appeal pursuant to 28 U.S.C. § 1292(b) from an interlocutory summary judgment entered in 1967. The plaintiffs argued that an order of the district court entered in 1965 had passed beyond review, to which this court replied:

> "We disagree. Just as defendants could have waited until final judgment and then have attacked on appeal all intermediate orders which involve the merits and necessarily affect the final judgment, so now, upon appeal from the interlocutory judgment they may have review of all prior orders which bear the same relationship to the interlocutory judgment." *Id.* at 432.

While some of this language appears to be helpful to the contention of the defendants here, we also note that the judgment appealed from in *Mills* was apparently a final determination of liability with the question of relief being reserved. There appears to be no question that upon an appeal from a final judgment, there can be a search of the entire record for any errors which may have been properly preserved. Further, it is not clear from the *Mills* opinion that the 1965 order was appealable at the time of its entry. If not, this would make *Mills* significantly different from the present case.

In *Tampa Phosphate Railroad Company v. Seaboard Coast Line Railroad Company,* 418 F.2d 387 (5th Cir. 1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 907, 25 L.Ed.2d 90 (1970), the appeal was from the denial of a motion to vacate a preliminary injunction. The court considered numerous aspects of the litigation reflecting upon the propriety of the grant of the injunction and affirmed the granting thereof. The issue of whether the court should have confined itself to the claim of changed conditions subsequent to the granting of the injunction does not appear to have been raised.

The defendants also quote from *Skirvin v. Mesta,* 141 F.2d 668, 672 (10th Cir. 1944):

> "But on appeal from an appealable order or from the final judgment, all interlocu-

tory orders affecting the rights of the parties in respect of the matters in question between them are open to review." In the paragraph preceding this quotation, however, it appears that the court again was dealing with a prior order which itself was not appealable, an entirely different situation than that here presented. The two remaining cases cited by the defendants are not sufficiently germane to the present issue to warrant further discussion.

There is a discussion of the present issue in 9 *Moore's Federal Practice*, ¶ 110.20[2], at 238–39 (2d ed. 1975).

"A change in the circumstances of the parties may put in question the propriety of continuing an initial grant of a preliminary injunction, and so provision is made in § 1292(a)(1) for an appeal from an order in response to a motion for modification or dissolution of the injunction. But the statute should not be read as making indefinite the time for appeal from the initial injunction. An appeal lies of right from an order granting an injunction, and the appeal must be taken within the time provided by Rule 4 of the Federal Rules of Appellate Procedure. An appeal from an order refusing to modify or dissolve the injunction should not be regarded as an appeal from an order continuing the injunction or refusing to modify or dissolve it unless new matter is presented to the district court on the hearing of the motion to dissolve or modify. But the language of the statute does permit a measure of pragmatism." (Footnotes omitted.)

The definiteness of the foregoing language facially would appear to preclude our reviewing at this time any aspects of the present case other than those which developed subsequent to the granting of the preliminary injunction. An examination of the supporting cases in the footnote, however, does not, in our opinion, justify the breadth or finality of the text. *Stiller v. Squeez-A-Purse Corp.*, 251 F.2d 561, 563 (6th Cir. 1958), does little more than to reach what would appear to be a correct result that a purely repetitive motion to dissolve an injunction may be treated as an attempt to appeal from the order granting the injunction and will be dismissed if untimely. In *Dahlen v. Kramer Machine and Engineering Products Co.*, 303 F.2d 293 (10th Cir. 1961), the court dismissed the appeal on the basis that it was not being taken from an appealable order. The court there declined to treat the motion to dismiss in the trial court as a motion to vacate the injunction even though sustaining the motion to dismiss the complaint might arguably have had the effect of vacating the injunction. The court emphasized that "the crucial fact remains that the trial court was not asked to dissolve the interlocutory injunction and did not, by its order sustaining the motion to dismiss [as to one defendant], refuse to dissolve such injunction." *Id.* at 295. The inference appears to be that if the vacation route had been pursued, the appeal would not have been dismissed. In any event the court did not treat the issue with which we are presently concerned. In the case before us, the defendants did both in form and substance seek a vacation of the injunction. *Cf. Securities and Exchange Commission v. Investment Corporation of America*, 369 F.2d 383 (7th Cir. 1966).

The third and last case cited by the Moore text is noted as being "*Contra,*" *American Grain Separator Co. v. Twin City Separator Co.*, 202 F. 202 (8th Cir. 1912). In that case, without any particular discussion of the issue, the court undertook an examination of the propriety of the issuance of the injunction upon an appeal from the denial of a motion to dissolve. The court found no exception to the right to appeal in the predecessor statute to 28 U.S.C. § 1292(a)(1) even though the motion to dissolve in reality only called for a rehearing on the ruling on the motion for injunction.

The mere statement of the proposition in the Moore text carries the weight that is customarily accorded that work; nevertheless, no underlying rationale appears to be advanced for what appears to be a strict constructionist or narrow approach. One rationale which occurs to us would be in the

nature of waiver: the opportunity existed for the appeal from the granting of the interlocutory injunction and obviously the restrained party did not choose to exercise his right of challenge. On the other hand, an undeviating or uncompromising rejection of any consideration of the propriety of the granting of a preliminary injunction when the appeal is from the denial of a motion to vacate that injunction puts the reviewing court in the position of saying that even though there may have been an error of law, a substantial mistake of predicate fact, or other demonstrable abuse of discretion in granting the injunction, the court cannot look at such matter now but must leave the injunction intact unless changes in the situation requiring modification have occurred subsequent to the granting. This position has inherent anomalies because these same grounds of invalidity of the injunction are not lost forever but can ordinarily be considered upon appeal from the permanent injunction entered as a part of a final judgment.

Because of the lack of clearly established guidelines for the situation, we will adopt Moore's "measure of pragmatism" and turn to the facts of this particular case to determine whether the door to examination of the preliminary injunction itself is closed.[6] As noted hereinbefore, a principal basis of the district court's decision to grant the injunction was that Fern had been denied Fourteenth Amendment substantive due process by the lack of any advance warning that the distribution of the material was impermissible. The corollary basis of the decision was that the conduct was not deemed so utterly outrageous that, constitutionally speaking, the teacher could be expected to have realized that it was impermissible. The court after reciting that reinstatement during the summer vacation period would seem to impose no serious bur-

den upon the defendants, then made it clear that he would give consideration to a motion to vacate or modify with concentration on the question of whether "plaintiff's presence in the school as a teacher in 1975–76 can reasonably be expected to produce a significant disruption of the school's function." While the injunction entered was open-ended and not confined just to the summer vacation period, we read the court's opinion as suggesting at least that the court would take a fresh look at the matter of continuing the injunction during the next school year. The court's opinion on the denial of the motion to vacate was announced from the bench. The court reaffirmed its opinion tentatively announced at the time of the granting of the injunction that the right to fair warning was of constitutional proportions. The court then addressed itself to a balancing process to determine whether the degree of possibility or probability of disruption was so severe that the court should withdraw its injunctive protection from Fern's constitutional rights.[7] The court concluded that the defendants had not made the extremely strong showing necessary. It appears to us that the court was squarely placing in one tray of the equity scales the constitutional rights to which this particular plaintiff could lay claim in this litigation and in the other tray the disruptive impact upon the school and the community. If there was no disabling impairment to that placed in the first tray, then our consideration of the present appeal could be quickly terminated. The balancing process would simply be an exercise of discretion which we would be disinclined to say was abused. On the other hand, if that which was placed in the first tray was impotent, or improperly the subject of consideration, then it would appear that in equity the injunction should have been vacated rather than continued, as it

6. We are not unmindful of certain aspects of circuity in the process: we must at least look through the door to see if we should open it.

7. For a recent decision in a school teacher case in which damages were sought and the reviewing court included in its opinion reference to

the balancing process in connection with the impact of teacher conduct in a small community, see *Sullivan v. Meade Independent School District No. 101*, 530 F.2d 799 (8th Cir. 1976), 44 U.S.L.W. 2424–25.

was in effect, during the oncoming school year.[8]

■ Without indicating any rule of general application to the scope of review of the denial of a motion to vacate a temporary injunction, we do determine upon the facts of this particular case that it is proper to consider whether there are sufficient infirmities in the bases of the court's granting of the preliminary injunction as to make it improper for the court to have refused to vacate the injunction.

■ The Fifth Circuit has recently summarized the criteria governing the issuance of a preliminary injunction:

The factors to be considered in determining whether preliminary injunctive relief is appropriate are:

(1) whether the plaintiff is likely to prevail on the merits;

(2) whether the plaintiff is in danger of suffering irreparable harm;

(3) whether the potential harm to the defendant from issuance of the injunction outweighs the possible harm to the plaintiff if injunctive relief is denied;

(4) whether issuance of a preliminary injunction will serve the public interest.

*Blackshear Residents Organization v. Romney*, 472 F.2d 1197, 1198 (5th Cir., 1973)

We are not unmindful of the impact of Fern's conduct upon the community as bearing upon the third and fourth of these criteria,[9] and assuming for the present purposes irreparable harm to the plaintiff not compensable in damages, we will direct our attention to the likelihood of the plaintiff prevailing on the merits in this case in its present state of development.

We turn first to the second prong of the district court's decision that the distribution of the material was not so outrageous that its impermissibility should have been obvious to the plaintiff. We are not advised from the record how well versed the high school seniors of this small rural community may have been in the vulgarities of street sexual terms, or perhaps more significantly, how cognizant their parents may have been of whatever versing their almost adult children may have had. When we turn to the fourth part of the distributed material, however, the situation is somewhat less obscure. Notwithstanding the marginal disclaimer that no circled answers were right or wrong, the labelling of those answers as the most liberal viewpoints appears to carry an implicit expression of teacher approval. We have great difficulty in conceiving that the parents of most communities would not find the distribution of this material to their children outrageously offensive, and more to the point, we have equally great difficulty in believing that Fern could have been unaware if he had applied the "contemporary community standards"[10] of the area in which he taught that the particular material should not be distributed to students as a part of a high school course. For the reasons set out hereinafter, however, we need not rest our opinion on this basis.

With regard to the first basis of the district court's decision, lack of fair warning, we have an initial difficulty in the statement in the court's opinion that this was a contention of the plaintiff. While it may have been advanced as a contention in oral argument which is not a part of the record before us, we do not find it otherwise advanced in the record. The basis of the plaintiff's complaint was that he was

---

8. After the court's ruling, the defendants sought a stay. The court very fairly pointed out that a stay of the denial of the motion to vacate would simply leave the injunction in effect. As a result of this colloquy, the defendants stated that their motion was directed to the June order which was the granting of the injunction.

9. We are also not unmindful of the probable impact that the teaching by Scopes had on his community and remember that this court has agreed "with the sentiments voiced by Professor Chafee when he observed that it is absurd to punish a person 'because his neighbors have no self-control and cannot refrain from violence,' Z. Chafee, Free Speech in the United States, 151–52 (1941)." *Crews v. Cloncs*, 432 F.2d 1259, 1265 (7th Cir. 1970).

10. *Cf. Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419, 430 (1973).

denied freedom of expression in violation of First and Fourteenth Amendment rights. A fair reading of the complaint indicates to us that the reference to the Fourteenth Amendment was in connection with the incorporation therein of First Amendment principles. This failure of a claim of lack of warning assumes some importance in the presentation of the case to the district court which was done expeditiously and without evidentiary development. Little purpose would be served by the defendants in their initial affidavits by asserting that the defendant had been advised that he should not distribute such material. If the material was such as to carry with it the imprimatur of the First Amendment, it ordinarily would be no defense that there had been an attempted prior curtailment of the right of expression.

In the affidavit of the district administrator filed in support of the motion to vacate which, of course, was filed after the district court had announced the basis of its decision, it was stated, as has been set out in full hereinbefore, that upon the resumption of teaching by Fern after his military service, he was told that he should clear any controversial material before using it in the classroom. Obviously, the administrative officials could not give specific warnings as to the text of materials of which they were unaware. The district administrator first learned of these materials either on the 19th or 20th of February and according to his affidavit "the use of these controversial materials had not been cleared through the principal's office directly contravening your affiant's and Hanley's instructions to Fern."

It may be argued that since the authorities knew all of this in advance of the granting of the injunction, the information should have been included in an affidavit filed at that time, cf. Stiller, supra at 562; however, as we have previously observed, it would reasonably have appeared to be of questionable significance at that time in the posture of the plaintiff's claim. In any event, the district court, although repeating the lack of warning as the predicate for his

decision, made no reference to the discussion between Fern and the two administrators at the time of resuming teaching, a time reasonably close to the time of distribution. Since there was no evidentiary hearing and since Fern filed no affidavit denying the discussion, it would appear that the discussion did take place. Under such circumstances, it would appear that Fern would be left only with the claim that he did not deem the material in question to be controversial, a position which presents some difficulties as we have already noted. At this time at least, we can only assume that he regarded the material as not being controversial and that is what he meant by the allegation in his complaint:

"23. That as of February 19, 1975, Plaintiff was unaware of any policy, express or implied, that Defendant School District had which restricted or prohibited the distribution and utilization of the Human Sexual Awareness Inventory heretofore listed as Exhibit A."

The district court in its opinion granting the preliminary injunction entertained no doubt: "There is no dispute on the present record that he received no such warning." That, of course, was correct on the record as it then stood. Even, however, if we should look at the record solely as it existed at the time of the granting of the preliminary injunction, we find a matter, apparently given no significance by the district court, to be of sufficient importance that the injunction should not have been granted. We refer to the fact that the plaintiff declined to pursue his claim in a hearing, an opportunity offered to him by the defendants.

It is clear at the outset of consideration of this aspect of the case that the plaintiff does not, indeed cannot, assert a claim of denial of procedural due process. As in *Birdwell v. Hazelwood School District*, 491 F.2d 490, 494–95 (8th Cir. 1974), in which the discharged teacher asserted various offenses to procedural due process:

"He is in no position before us to complain of these alleged deficiencies. He was aware of the time and the place of

the Board meeting, that his continued employment was at stake, and that his dismissal was being recommended because of his statements in class and his actions towards the servicemen in the building. Nevertheless, with this knowledge, and after conferring with legal counsel, it was his decision not to attend the meeting.

"The 'standards of procedural due process are not wooden absolutes.' The sufficiency of the procedures must be judged in the light of the totality of the circumstances. The fundamental requirement of due process 'is the opportunity to be heard, "at a meaningful time and in a meaningful manner." * * * This opportunity must be "appropriate to the nature of the case." * * * "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." '

"The opportunity thus demanded was here afforded but appellant deliberately chose not to avail himself of it and not to present to the Board the arguments made to us. He cannot now scour the record of the hearing he thus ignored for flaws in its conduct. We find a voluntary and knowing waiver. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)." (Footnotes omitted.)

In *Birdwell*, the plaintiff complained of deficiencies in the hearing actually conducted. Here the plaintiff was offered the opportunity upon his request to have a hearing upon which his continued employment obviously was at stake which hearing would have been before an independent hearing officer with an opportunity to present testimony and other evidence. The plaintiff was further entitled upon request to have given to him "the reasons being considered for possible discharge." While it does not appear affirmatively in the present record that he acted upon advice of counsel, it does appear that the Wisconsin Education Association Council, which provided counsel for Fern throughout the litigation, had been furnished a copy of the HSAI as early as March 10 and did receive a copy of the

April 11 offer of a hearing when it would still have been timely to have requested the hearing. For rather obvious reasons, the plaintiff's complaint did not sound in denial of procedural due process. As we have already observed, it did not specify substantive due process. It was not until the granting of the preliminary injunction that we find a reference in the record to a denial of what can only be substantive due process.

In a recent teacher case dealing with a claim of violation of the constitutional right of substantive due process, this court speaking through then Judge Stevens stated the following:

"The claim that a person is entitled to 'substantive due process' means, as we understand the concept, that state action which deprives him of life, liberty, or property must have a rational basis—that is to say, the reason for the deprivation may not be so inadequate that the judiciary will characterize it as 'arbitrary.' Since standards of 'irrationality' or 'arbitrariness' vary from time to time and from judge to judge, applications of the concept—indeed, the concept itself—have generated serious criticism of the judiciary and the judicial function." (Footnotes omitted.) *Jeffries v. Turkey Run Consolidated School District*, 492 F.2d 1, 3–4 (7th Cir. 1974).

While this court found it unnecessary to appraise the viability of the concept "or the extent to which it authorizes federal judges to impose their own views about what is 'unrelated to the educational process or to working relationships within the educational institution' upon locally elected school boards," (*Id.* at 4, footnote omitted) we read in the opinion a guideline of restrictive caution in the application of the concept. The matter of the background and analysis of the concept is further pursued with similar effect in *Buhr v. Buffalo Public School District No. 38*, 509 F.2d 1196 (8th Cir. 1974).

The concept of due process, without regard to whether categorized as procedural or substantive, is one which despite the

Supreme Court through years of adjudication having put flesh on it[11] has not lent itself too well to succinct definition. "[T]here is no table of weights and measures for ascertaining what constitutes due process."[12] If one word were picked to convey the sense that is to be found in the myriad judicial words devoted to the subject it is "fairness."[13] This indeed has figured in the longer definitions.

> "It is ingrained in our national traditions and is designed to maintain them. In a variety of situations the Court has enforced this requirement by checking attempts of executives, legislatures, and lower courts to disregard the deep-rooted demands of fair play enshrined in the Constitution." Mr. Justice Frankfurter concurring in *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 643, 95 L.Ed. 817, 848 (1951).

> "Furthermore, due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process." Mr. Justice Clark in *Breithaupt v. Abram*, 352 U.S. 432, 436, 77 S.Ct. 408, 410, 1 L.Ed.2d 448, 451 (1957).

Concepts of what may constitute fundamental fairness may change from decade to decade, and indeed have changed. This, however, does not negate the existence of fundamental fairness as the primary attribute of due process. It is clear to us that the primary sense of due process is "an opportunity to be heard and to defend its substantive right." *Brinkerhoff-Faris Co. v. Hill*, 281 U.S. 673, 678, 50 S.Ct. 451, 453,

74 L.Ed. 1107, 1112 (1930). In other words, to the extent that substantive due process is recognized as a separate concept, it constitutes that which the fundamental law of the land as embodied in the constitutional phrase "due process of law" protects by affording anyone who claims a violation thereof the meaningful opportunity of demonstrating such violation through the procedure of a fair hearing. When such a hearing is offered, the offeree should assume that it will be a fair hearing until the offeror indicates otherwise. *Suckle v. Madison General Hospital*, 499 F.2d 1364, 1367 (7th Cir. 1974).

In the case before us there is no indication whatsoever, despite the claimed community turmoil, that the hearing before an independent officer appointed for the purpose would be other than completely fair, affording the plaintiff a full and meaningful opportunity to present his reasons for not being discharged. Further, we do not regard due process as being simply a strategic weapon with which a person may sustain his claim at any cost; the underlying rationale of fairness in due process would appear to preclude such a use. Thus, in the present case, the proposed hearing would have made the record complete in a hearing not only as to the position of the plaintiff on the subject but also, in fairness, as to the position of the community.

█ In a careful and well-reasoned examination of due process, Justice Harlan in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), has pointed out that although many controversies have raged about the cryptic and abstract words of the Due Process Clause, at a minimum the words require that deprivation of life, liberty or property by adjudication be pre-

---

**11.** *Boddie v. Connecticut*, 401 U.S. 371, 375, 89 S.Ct. 2138, 23 L.Ed.2d 763 (1971).

**12.** Mr. Justice Frankfurter in a separate opinion urging reargument in *Burns v. Wilson*, 346 U.S. 137, 149, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508, 1518 (1953).

**13.** The matter has been put rather well by a newspaper columnist recently:

"Due process is hard to define, but it has as its end product something akin to fundamental fairness. Yet, it's more than the right of fair treatment. It's also a guarantee of the right to fight for it." Leonard M. Groupe, Chicago Daily News, January 7, 1975.

The defendants honored the guarantee; Fern elected not to pursue his rights in the crucial forum.

ceded by notice and opportunity for hearing appropriate to the nature of the case. *Id.* at 377–78, 91 S.Ct. at 375–76, 28 L.Ed.2d at 118–19. He then proceeds to a premise which we believe to be applicable in the present case that due process does not, of course, require that the defendant in every civil case actually have a hearing on the merits. Thus, a state can, for example, enter a default judgment against a defendant who, after adequate notice, fails to make a timely appearance. *Id.* at 378, 91 S.Ct. at 786, 28 L.Ed.2d at 119. "That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest . . . ." *Id.* at 378–79, 91 S.Ct. at 786, 28 L.Ed.2d at 119. In the case before us, Fern was offered such an opportunity. In our opinion, his failure to accept the offer of a hearing constituted a waiver of the claim that he might have presented at such hearing that he was deprived of a constitutional right by lack of warning that he should not have distributed the materials in question.

Nor is this a matter of requiring him to have exhausted remedies before proceeding in federal court. As stated by Judge Cummings in *Suckle, supra* at 1367, "[t]he inquiry required of plaintiff by this opinion does not amount to exhaustion of remedies; rather, it is necessary to demonstrate the existence of a case or controversy."

Although not articulated in the district court's opinion, an implicit premise underlying its conclusion that plaintiff was likely to succeed on the merits was that the claim of lack of notice was viable and had not been waived. Even if it could be argued that there was no abuse of discretion, a preliminary injunction cannot be sustained upon review by the appellate court when that court deems that "the trial court has proceeded upon a premise as to the rule of law" found to be erroneous. *Northeast Construction Company v. Romney*, 157 U.S. App.D.C. 381, 485 F.2d 752, 756 (1973). It is our holding therefore that the district court

erroneously denied the motion to vacate the preliminary injunction.

Accordingly, the order of denial of vacation of the preliminary injunction is reversed and the cause is remanded to the district court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

FAIRCHILD, Chief Judge (dissenting).

I respectfully dissent. The test on appeal from a preliminary injunction is whether there was a clear abuse of discretion in the district court's balancing of the pertinent factors. *Banks v. Trainor*, 525 F.2d 837, 841 (7th Cir. 1975). I do not find such abuse in this case.

There are three principal propositions with which the district court had to deal.

1. *Whether plaintiff is likely to succeed in showing that he did not violate instructions in failing to obtain clearance before using the "Inventory."* The notice of discharge of plaintiff, dated May 6th, gave as the reason for the discharge that the use of the Inventory caused disruption of discipline and danger of harm to people. It gave no hint of a claim that plaintiff had violated instructions by using controversial material without clearance in advance. That claim was first made in August on the motion to vacate the preliminary injunction. If an instruction had been given and violated, such violation would most naturally have been assigned as a cause on May 6th. The court could therefore properly discount the claim that an instruction had been given.

2. *Whether in the absence of instructions, plaintiff is likely to succeed in showing that he need not have known that use of the Inventory was, under the circumstances, improper performance of the teaching job.* Whatever one may think of the Inventory, it was germane to the general title of the course assigned to plaintiff, Contemporary Living, and to the chosen topic, Sex and the New Morality, and in plaintiff's experience, it had been used with persons some of whom were in the same

age group as plaintiff's students. It is by no means clear that in distributing the Inventory, plaintiff conveyed to the students advocacy of unlawful conduct, although it is arguable that some of the indicated answers did so.

3. *The degree of disruption and danger to persons reasonably to be expected because of popular antipathy toward plaintiff.* The board's discharge appears to have treated threats of violence and other popular expressions against plaintiff as sufficient cause, standing alone for discharge. I do not believe that it was lawful cause, although it could well be weighed as a circumstance on the side of denying an injunction. Considering it as such circumstance, it should be remembered that in June, when the injunction was granted, more than three months cooling period had elapsed, the court was aware that there would be two months of vacation immediately ahead, and the court promised a prompt hearing on a motion to vacate, particularly grounded on a showing of reasonably to be expected disruption. The court ordered that plaintiff be restored to the payroll, but carefully avoided any requirement of backpay. By mid-August, when the motion to vacate was heard, almost six months had elapsed, and the district judge could, as he did, require an "extremely strong showing" of probable disruption. In the nature of human affairs it is reasonable to assume that the probability of a significant disruption as a result of one event substantially diminishes with the passage of time.

In my opinion, the district court did not abuse its discretion in deciding the probability of plaintiff's ultimate success, and balancing that and other factors so as to determine that the preliminary injunction should not be vacated.

As I understand the facts, the property entitlement of plaintiff which was involved in the action consisted of (1) his right, in the absence of his giving cause for discharge, to complete the 1974–75 school year and (2) his right, since he had not been given timely notice otherwise, to contract for the 1975–76 school year. The preliminary injunction, beginning in June, 1975, affected primarily element (2), leaving the question of damages for loss of most of element (1) and claims for other types of relief such as expunging the record of discharge, to trial on the merits. It may well be, under the circumstances, that the order appealed from should be modified by providing expressly that it does not require defendant to employ plaintiff after the close of the 1975–76 school year, but I do not agree with reversal.