Ricardo A. GODINEZ, David Lee Kines and Raymond S. Larsen, Plaintiffs-Appellees,

v.

Michael P. LANE, Kenneth L. McGinnis and John Wright, Defendants-Appellants.

No. 83–3094.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1984.

Decided May 9, 1984.

As Amended May 9, 1984.

Michael T. Mullen, Norman B. Berger and Thomas A. Ioppolo, Chicago, Ill., for defendants-appellants.

Mark Erich Weber, Mayer, Brown & Platt, Chicago, Ill., for plaintiffs-appellees.

Before BAUER, COFFEY and FLAUM, Circuit Judges.

COFFEY, Circuit Judge.

Defendants-appellants, administrative officials of the Illinois Department of Corrections, appeal an interlocutory order of the United States District Court for the Central District of Illinois, modifying a preliminary injunction entered on July 28, 1983. We reverse the order of the district court and remand this case for a hearing on the permanent injunction.

## I

The plaintiffs in this action are protective custody inmates at the Pontiac Correctional Center ("Pontiac"), one of four adult-male maximum security prisons operated by the Illinois Department of Corrections. Pontiac houses approximately 1,200 inmates in the general prison population and between 250 and 270 inmates in protective custody units. The Illinois Department of Corrections operates its protective custody units under a consent decree, *Meeks v. Lane,* No. 75–C–96 (N.D.Ill. July 1981) (unpublished consent decree), issued by a three judge panel of the United States District Court for the Northern District of Illinois. The decree provides in pertinent part:

> "Each maximum security institution will have a provision for protective custody placement in a protective custody area.
>
>     ＊    ＊    ＊    ＊    ＊    ＊
>
> Inmates who believe that their safety and security are being threatened in the general population may request protective custody placement."

Similarly, Ill.Adm.Reg. 808, promulgated by the Illinois Department of Corrections in June 1982, provides that "[e]ach maximum security institution shall maintain an area for placement of committed persons in protective custody.... A committed person may request placement in protective custody.... Reassignment from the general population to protective custody shall be

accomplished as expeditiously as possible." [1]

In March 1983, the plaintiffs, acting *pro se*, filed a complaint under 42 U.S.C. § 1983, alleging, *inter alia*, that officials of the Illinois Department of Corrections were violating their Eighth Amendment right to be free from cruel and unusual punishment by allowing inmates of the general prison population access to the protective custody units. In addition, the plaintiffs filed a motion for a temporary restraining order requesting that the defendants be enjoined from "acting in a manner which is illegal." The district court treated the plaintiffs' motion for a temporary restraining order as one for a preliminary injunction, and after the plaintiffs had counsel appointed, the court conducted an evidentiary hearing on the issue of a preliminary injunction.

At that hearing, in July 1983, it was established that approximately 75% of the inmates incarcerated at Pontiac belonged to gangs within the prison. The district court found that:

"The gangs have a hierarchy and maintain discipline among their members. The gangs engage in extortion, possession and control of contraband, including weapons, and other criminal activities within the inmate community. An aspect of criminal activities of the gangs is the use of violence to achieve their goals.

\*    \*    \*    \*    \*    \*

Gang recruitment is an ongoing virulent practice at Pontiac. Inmates are pressured when they enter to associate with a gang, or if they are already members, to continue in that association.

Money, services, commissary privileges, and sexual favors are extorted and protection given in return."

According to the testimony elicited at the evidentiary hearing, the plaintiffs requested placement in the protective custody unit because of their fear that gang retaliation and violence posed a serious threat to their security and well-being. The district court found, however, that in order "[t]o enforce discipline over gang members or to further extortion of sexual favors and money or its equivalent, gang leaders seek ways of reaching inmates who have sought refuge in the protective custody unit." The court added that "[g]ang leaders seek to infiltrate gang members into the protective custody unit to further gang activities and discipline." According to the district court, gang members of the general population could infiltrate the protective custody unit by requesting placement in the protective custody unit; entering the protective custody line as it moved to the dining hall; entering the dining hall while protective custody inmates were present; or obtaining permission from correctional officers to enter the protective custody unit cellblocks. The district court found that "[o]n occasion assaults of protective custody inmates by general population inmates have occurred during or in dining hall movements and also during commissary movements of the protective custody inmates," however, the court further found that "for the past year no serious harm has occurred to any Pontiac inmate in protective custody."

Based upon the foregoing findings of fact, the district court ruled that protective custody inmates were "exposed to an unreasonable risk of harm." Accordingly, the district court entered a preliminary injunction on July 28, 1983, and ordered the prison officials at Pontiac to repair the fence separating the general population cellblocks from the protective custody cellblocks; conduct movements of the protective custody inmates from the prison to the dining hall "in close order formation"; clear common areas of the general population inmates before allowing the protective custody inmates to pass; prevent the general population inmates from coming within twenty feet of a protective custody line movement; allow the general population inmates to enter the protective custody cellblocks only with warden authorization and officer verification; prevent the general

**1.** Ill.Adm.Reg. 808 has been proposed for codification in Ill.Rev.Stat. ch. 20 § 501.300 *et seq.* *See* 7 Illinois Register 12707–11 (September 30, 1983).

population inmates from dining with the protective custody inmates; isolate the general population inmates from the protective custody inmates in the prison hospital; place correctional officers inside the north and west cellhouse watch towers from 7:00 a.m. to 11:00 p.m.; refrain from placing inmates who are on investigative status in the protective custody units; submit to the court within sixty days a practical method of screening inmates before they are placed within protective custody units; and finally, refrain from placing the protective custody inmates in the general population during the pendency of this litigation.

On August 17, 1983, some twenty days after the entry of the preliminary injunction, the defendants filed a motion to suspend the injunction. Following a hearing on the defendants' motion to suspend, the district court entered an interlocutory order modifying the preliminary injunction. In that order, entered on October 21, 1983, the district court provided that only the watch towers in the west cellhouse had to be occupied from 7:00 a.m. to 11:00 p.m. In addition, the court reduced to thirty days the time period in which the prison officials had to submit a practical method of screening inmates before placing them in the protective custody units. The court added that, "[i]n all other respects the preliminary injunction of July 28, 1983, remains in full force and effect."

The defendants filed a timely appeal of the district court's October 21 order modi-fying the preliminary injunction, and sought a stay of the injunction pending appeal.[2] On December 5, 1983, a panel of this court granted the defendants' motion to stay the preliminary injunction "pending resolution of this appeal." The issue presently before this court is whether the district court erred in entering the preliminary injunction.

## II

The plaintiffs initially contend that this court lacks jurisdiction to review the original preliminary injunction entered by the district court on July 28, 1983. In support of this position, the plaintiffs note that the defendants did not file an appeal in this action until November 21, 1983, some four months after the entry of the original preliminary injunction. According to the plaintiffs, the defendants' failure to appeal the preliminary injunction within thirty days of its entry violated Fed.R.App.P. 4(a),[3] and precludes this court from reviewing the district court's order of July 28, 1983. The plaintiffs acknowledge that on August 17, 1983, the defendants filed a motion to suspend the preliminary injunction in the district court, but point to the fact that this motion was filed some twenty days after the district court had entered the preliminary injunction. According to the plaintiffs, the motion to suspend the preliminary injunction was not timely filed under Fed.R.Civ.P. 52(b), 59(a), or 59(e), within ten days of the entry of the preliminary injunction, and thus the defendants failed to toll the thirty day period for filing

---

**2.** The defendants' "Notice of Appeal" to this court provided that:

> "Notice is hereby given that MICHAEL P. LANE, et al., defendants herein, hereby appeal to the United States Court of Appeals for the Seventh Circuit from the order entered in this action on the 21st day of October, 1983, modifying *the preliminary injunction order entered in this cause on July 28, 1983, and denying defendants' motion for suspension of said preliminary injunction order."

**3.** Fed.R.App.P. 4(a) provides:

> "(1) In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the

clerk of the district court within 30 days after the date of the entry of the judgment or order appealed from.

> \*　\*　\*　\*　\*　\*

> (4) If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party: (i) for judgment under Rule 50(b); (ii) under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (iii) under Rule 59 to alter or amend the judgment, of (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any such motion...."

an appeal under Fed.R.App.P. 4(a). *See, e.g., Browder v. Director, Illinois Department of Corrections*, 434 U.S. 257, 264–65, 98 S.Ct. 556, 560–61, 54 L.Ed.2d 521 (1978) (motion filed twenty-eight days after order entered is untimely under Fed.R.Civ.P. 52(b), 59 to toll the thirty day appeal period of Fed.R.App.P. 4(a)). Based upon this unfolding of the procedural facts, the plaintiffs claim that this court lacks jurisdiction to review the original preliminary injunction.

■ The jurisdiction of this court to review an interlocutory order of the district court, in the form of a preliminary injunction, is provided for in 28 U.S.C. § 1292(a)(1) (1982).

"The courts of appeals shall have jurisdiction of appeals from:

Interlocutory orders of the district courts ... granting, continuing, modifying, refusing, or dissolving injunctions, or refusing to dissolve or modify injunctions ...."

Accordingly, this court has jurisdiction to review interlocutory orders that grant preliminary injunctions and also interlocutory orders that modify existing preliminary injunctions. *See* 9 J. Moore, B. Ward, and J. Lucas, Moore's Federal Practice ¶ 110.20[2] (2nd ed. 1983).

In the instant case, the district court entered its preliminary injunction on July 28, 1983. Some twenty days later, the defendants filed a motion to suspend the preliminary injunction in the district court. Though this motion was not filed within the ten day period required of Fed.R.Civ.P. 52(b), 59(a), or 59(e), it did present the court with additional information concerning the status of the protective custody units at Pontiac. According to the defendants' motion to suspend, prior to entry of the preliminary injunction, officials at Pontiac had repaired the fence separating the general population cellblocks from the protective custody cellblocks; required the protective custody inmates to proceed to the dining hall in "close order formation"; prevented the general population inmates from contacting the protective custody inmates in the general common areas; required the prison guards to request verification of all persons entering the protective custody cellblocks; and prevented the general population inmates from eating with the protective custody inmates in the dining hall. In addition, the defendants complained that certain provisions of the preliminary injunction could not be "feasibly or practically complied with." According to the defendants, it was imperative that prison officials have discretion in determining how close the general population inmates could come to the protective custody inmates; which inmates could be housed in protective custody units; and which inmates could be admitted to the protective custody units in an emergency situation. The defendants further complained that they were unable to isolate the general population inmates from the protective custody inmates in the prison hospital; man the watch towers in the north and west cellhouses from 7:00 a.m. to 11:00 p.m., without hiring additional guards at additional costs; or formulate a plan to screen inmates seeking protective custody that complied with Ill.Adm.Reg. 808 and the *Meeks v. Lane* consent decree.

■ In response to the defendants' motion to suspend, the district court modified its preliminary injunction on October 21, 1983, stating that:

"[T]he court makes the following *modifications* to the preliminary injunction of July 28, 1983:

9. Correctional officers shall be inside the tower on the even side of the west cellhouse at all times between 7:00 a.m. and 11:00 a.m. [sic]

12. The defendant shall supply within 30 days of this amendatory order their [sic] recommendations for a practical method of screening inmates who seek placement in protective custody to prevent infiltration of the protective custody unit by gang members for purposes of enforcing gang discipline or exacting revenge on inmates within the protective custody unit.

*In all other respects the preliminary injunction of July 28, 1983, remains in full force and effect."* (emphasis added). The express language of the October 21 order reveals that the district court did, in fact, modify the original preliminary injunction. The record further reveals that the defendant satisfied Fed.R.App.P. 4(a)(1) and filed a timely notice of appeal of this October 21 order. Accordingly, this court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's interlocutory order modifying the preliminary injunction.[4]

█ The core issue is the scope of this court's review of that October 21 interlocutory order, consisting of modifications to the original preliminary injunction and language that, "[i]n all other respects the preliminary injunction of July 28, 1983, remains in full force and effect." It is well-settled that "[o]nce a timely appeal is taken from an order made appealable by statute, the power of a court of appeals should be plenary to the extent that it chooses to exercise it. *A court should not close its eyes to what is plainly there."* 9 J. Moore, B. Ward, and J. Lucas, Moore's Federal Practice ¶ 110.25[1] (2nd ed. 1983) (emphasis added) In the instant case, the October 21 interlocutory order, presently before this court for review, expressly provides that the original preliminary injunction remains in full force and effect. Such language clearly reveals that the terms of that original preliminary injunction are be-

fore this court under our plenary power of review. On the other hand, the general rule is that "[a]n appeal lies of right from an order granting an injunction, and the appeal must be taken within the time provided by Rule 4 of the Federal Rules of Appellate Procedure." 9 J. Moore, B. Ward, and J. Lucas, Moore's Federal Practice ¶¶ 110.20[2], 110.21 (2nd ed. 1983). *See also Browder v. Director, Illinois Department of Corrections,* 434 U.S. at 264, 98 S.Ct. at 560; *Buckhanon v. Percy,* 708 F.2d 1209, 1214 (7th Cir.1983) (*"Buckhanon"*); *Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc.,* 579 F.2d 786, 790 (3d Cir.1978). In the instant case, the defendants failed to comply with Fed.R.App.P. 4(a) and file a timely appeal of the original preliminary injunction within thirty days of its entry. The plaintiffs argue that if we review the terms of the modified preliminary injunction, we are, in effect, reviewing the terms of the original preliminary injunction and thus circumventing the timely appeal requirement of Fed.R.App.P. 4(a).

In support of their position, the plaintiffs rely chiefly upon this court's decision in *Buckhanon.* In that case, the district court entered a preliminary injunction in January 1982, that ordered the defendant, State of Wisconsin, to pay the plaintiffs' January benefits under the Aid to Families with Dependent Children ("AFDC") and the Medical Assistance ("MA") programs, due to the State's failure to provide the plain-

---

**4.** The plaintiffs characterize the district court's interlocutory order of October 21, 1983, as a denial of the defendant's motion to suspend the preliminary injunction. In so doing, the plaintiffs attempt to fit the facts of the instant case within the facts of cases where this court has refused to review the denial of a motion to dissolve or modify a preliminary injunction because the motion was merely an attempt to provide a basis for appeal and/or reargue the original preliminary injunction. In *Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735 (7th Cir.1976), this court refused to consider the appeal of an order denying a motion to vacate the preliminary injunction because "the reason for the motion was to provide a basis for appeal since the time for appeal had expired from the original order entering the injunction." 534 F.2d at 750. Similarly, in

*United States v. City of Chicago,* 534 F.2d 708 (7th Cir.1976), this court stated that "[a]n appeal from denial of a purely repetitive motion to dissolve an injunction has at times been treated as an attempt to appeal from the order granting the injunction and dismissed if untimely." 534 F.2d at 711 (citing *Stiller v. Squeez-A-Purse Corp.,* 251 F.2d 561, 563 (6th Cir.1958)). *See also Winfield v. St. Joe Paper Co.,* 663 F.2d 1031 (11th Cir.1981) (per curiam). In the instant case, the district court expressly modified the preliminary injunction in its October 21 order, thus providing this court with jurisdiction under 28 U.S.C. § 1292(a)(1) to review the October 21 order. Accordingly, we need not address the issue of whether this court would have jurisdiction to review the district court's denial of the defendants' motion to suspend the preliminary injunction.

tiffs with adequate notice of termination in December 1982. *See Buckhanon v. Percy*, 533 F.Supp. 822, 825–28 (E.D.Wis.1982). The defendants did not appeal the preliminary injunction but did ask the district court to clarify whether or not the order to pay January benefits violated the Eleventh Amendment, in a post-hearing motion. In June 1982, the district court issued an order in response to the defendants' oral motion to clarify, stating that the order to pay January AFDC benefits at December levels did not violate the Eleventh Amendment, but that the order to pay the same MA benefits was effective only for services received after the January entry date of the preliminary injunction. On appeal of the June order, a panel of this court held that the motion to clarify was, in effect, a motion to modify the January order, and thus, this court had jurisdiction under 28 U.S.C. § 1292(a)(1) to review the June order. *Buckhanon*, 708 F.2d at 1212–13. The court further ruled, however, that the scope of review was limited to the Eleventh Amendment issue and did not extend to the notice issue of the underlying preliminary injunction because the defendants had failed to appeal that injunction within the thirty day time period of Fed.R.App.P. 4(a). *Id.* at 1213–14.

We note that the facts in the instant case are markedly distinguishable from those in *Buckhanon*, where the defendants were ordered to pay January benefits due to their insufficient notice of termination in December, and later raised the separate and distinct issue of whether the order violated the Eleventh Amendment. As the court in *Buckhanon* stated, the notice issue, which was the subject of the preliminary injunction, was "separable from the Eleventh Amendment issue raised in the June order ...." *Id.* at 1214. In the instant case, the October 21 order actually altered the terms of the July 28 preliminary injunction and expressly provided that "[i]n all other respects the preliminary injunction of July 28, 1983, remains in full force and effect." This language clearly reveals that the terms of the original preliminary injunction are expressly incorpo-

rated in the October 21 order, and thus the original July 28 order and the subsequent October 21 order are inseparable, and must be read in conjunction with each other. Furthermore, in *Buckhanon*, the court embarked upon a thorough analysis of whether the defendants' motion to clarify the preliminary injunction constituted a motion to modify for purposes of 28 U.S.C. § 1292(a)(1). The court concluded that:

> "[A]lthough [the district court] considered the question of liability, the court never considered whether a district court had the authority, in an opinion issued on January 14, to order as a remedy payment of January benefits. *Because this presents an important and substantially different question from that decided in the order of January 14, 1982*, we therefore hold that the order of June 1, 1982, is appealable under 28 U.S.C. Section 1292(a)(1) and that we therefore have jurisdiction with respect to it."

*Id.* at 1213. (emphasis added). In the instant case, it is clear that the district court did, in fact, alter and modify the preliminary injunction after the defendants had presented the court with additional evidence on the status of Pontiac's protective custody units at the hearing on the motion to suspend. This evidence concerned the very subject matter of the preliminary injunction, Pontiac's protective custody units, not "an important and substantially different question." *Id.* Thus, unlike the facts in *Buckhanon*, the court's modifications actually changed the terms of the original preliminary injunction.

Finally, the court in *Buckhanon* noted that the factors present in *Fern v. Thorp Public School*, 532 F.2d 1120 (7th Cir.1976) ("*Fern*"), that allowed this court, upon review of the district court's denial of a motion to vacate, to review the underlying preliminary injunction, were not present. In *Fern*, the district court entered a preliminary injunction enjoining the defendant school board from discharging the plaintiff, but suggested that it "would take a fresh look at the matter of continuing the injunction during the next school year." *Id.* at

1129. The defendants failed to comply with Fed.R.App.P. 4(a) and appeal the preliminary injunction within thirty days of its entry, but did file a motion to vacate the injunction, which the district court denied. The defendants appealed this denial of the motion to vacate, and on appeal, argued that the entry of the original preliminary injunction was improper. A panel of this court held that, "we do determine upon the facts of this particular case that it is proper to consider whether there are sufficient infirmities in the bases of the court's granting of the preliminary injunction as to make it improper for the court to have refused to vacate the injunction." *Id.* at 1130.

The court in *Buckhanon* stated that "the *Fern* decision appears to have been linked to a situation in which two factors coincided: 1) the failure to appeal was excusable, and 2) the court perceived a substantial abuse of discretion in the granting of the injunction in the first instance." *Buckhanon*, 708 F.2d at 1214 (citing 16 C. Wright, A. Miller, E. Cooper, and E. Gressman, *Federal Practice and Procedure* § 3924 (1977 & Supp.1982)). *See also Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc.*, 579 F.2d at 791 (in "special circumstances" the scope of appellate review might reach the underlying injunction). *Cf. Cerro Metal Products v. Marshall*, 620 F.2d 964, 972 (3rd Cir.1980) (inextricably intertwined issues present the court with "special circumstances" that permit review of the underlying injunction). In the instant case, we need not reach the issue of whether the two factors that were present in *Fern*, allowing the court to review the underlying preliminary injunction, are present before us. In *Fern*, the district court *denied* the defendants' motion to vacate the preliminary injunction from the bench. 532 F.2d at 1126. Thus, when the defendants appealed that denial, the sole issue before this court was the trial court's denial of the motion to vacate. That denial, as recited from the bench, contained no reference to the original preliminary injunction nor did it incorporate the terms of that injunction. Indeed, it was only the presence of "special circumstances," namely an excuse for failure to appeal the preliminary injunction and a substantial abuse of discretion in originally granting the preliminary injunction, that allowed the court to review the underlying preliminary injunction. In the instant case, the district court actually altered the preliminary injunction and incorporated its terms in the October 21 interlocutory order. The "special circumstances" of *Fern* are not required to review the terms of a preliminary injunction that is modified and expressly incorporated in an order properly before this court for review. Accordingly, we exercise our plenary power and review the entire October 21 order, including the modifications and the "preliminary injunction of July 28, 1983 [which] remains in full force and effect."

■ We turn our attention to the central issue in this case, whether the district court erred in entering the original preliminary injunction, later modified in the October 21 order. It is well-settled that to obtain a preliminary injunction, the plaintiff must establish:

"(1) [he] has at least a reasonable likelihood of success on the merits,

(2) [he] had no adequate remedy at law and will otherwise be irreparably harmed,

(3) the threatened injury to [the plaintiff] outweighs the threatened harm the preliminary injunction may cause the defendants, and

(4) the granting of the preliminary injunction will not disserve the public interest."

*Syntex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 681 (7th Cir.1983) (citing *Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d 795, 796–97 (7th Cir.1981)). *See also Alexander v. Chicago Park District*, 709 F.2d 463, 467 (7th Cir.1983); *Shango v. Jurich*, 681 F.2d 1091, 1096–97 (7th Cir.1982). The plaintiff has the burden of proving each of these factors, *see Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346, 1349 (7th

Cir.1982), and in considering each factor, "a district court must weigh carefully the interest on both sides." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975). On appeal, this court must determine "whether the issuance of the [preliminary] injunction in light of the applicable standard, constituted an abuse of discretion." *Id.* at 931–32, 95 S.Ct. at 2568. *See also Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d at 1349; *Shango v. Jurich*, 681 F.2d at 1096; *Machlett Laboratories, Inc. v. Techny Industries, Inc.*, 665 F.2d at 797.

The district court found that the plaintiffs had satisfied their burden of proving the four factors necessary to grant a motion for a preliminary injunction. According to the district court:

"The plaintiffs have at least a reasonable likelihood of success on the merits .... The failure to maintain the precautions and enforce the separation called for under the provisions of Administrative Regulation 808 and the principles of the *Meeks* decree constitutes an exposure of inmates to an unreasonable risk of harm....

It hardly needs discussion to say that the physical harm and risk of death or serious injury to which the plaintiffs are exposed is an irreparable injury for which there is no adequate remedy at law....

It is equally apparent that the minimization of the risk of harm to the plaintiffs outweighs any detriment to be experienced by the defendant where the minimization may be brought about by enforcement of existing regulations and policies of the defendant and by minor changes in procedures....

It is apparent to this court that the public interest is served rather than disserved by requiring the defendants to adhere to and enforce their own policies. No substantial increase in expense would be experienced by the Illinois Department of Corrections by maintaining segregation of the two prison populations, and the exposure to risk of harm by the inmates would be reduced. Proper maintenance of penal institutions is clearly in the public interest."

In ruling that the plaintiffs were entitled to a preliminary injunction, the district court was well aware of the fact that in June 1982, officials of the Illinois Department of Corrections had promulgated Ill.Adm.Reg. 808, a six-page policy statement setting forth the purpose and detailing the procedures for operating protective custody units within maximum security prisons. Likewise, the district court was well aware of the fact that the Illinois Department of Corrections was operating its protective custody units under the *Meeks v. Lane* consent decree, issued in July 1981. Indeed, the court found that, "[p]rotective custody is obtained by an inmate by following the procedures of the Department of Corrections outlined in Administrative Regulation 808 .... The Department of Corrections is operating its protective custody units under the *Meeks v. Lane*, (No. 75–C–96 USDC N.D.Ill.) decree issued by the Northern District of Illinois."

A review of Ill.Adm.Reg. 808 reveals that the defendants, as officials of the Illinois Department of Corrections, knew of the protective custody inmates' needs, and were, in fact, providing such inmates with protection and separation from the general population inmates. In Ill.Adm.Reg. 808, the Illinois Department of Corrections provides that:

"The protective custody area shall not be physically located on the same gallery as disciplinary segregation facilities. *Neither general population nor disciplinary segregation individuals shall be permitted to have access to this area except as approved by the Chief Administrative Officer or his designee.*

Prior to multiple celling in the protective custody area, the security needs of the individual persons shall be reviewed by the Chief Administrative Officer or his designee." (emphasis added).

Furthermore, the *Meeks v. Lane* consent decree, under which the Illinois Depart-

ment of Corrections operates its protective custody units, provides that:

"Each maximum security institution will have a provision for protective custody placement in a protective custody area. ("PCA.")

\* \* \* \* \* \*

"Inmates who believe that their safety and security are being threatened in the general population may request protective custody placement. At least once every 30 days, a correctional counselor shall interview each inmate confined to a PCA or to any area other than a PCA where inmates are held for their own protection to determine the necessity of their continued placement there. With regard to any inmate who has been confined to a PCA or to any area other than a PCA for his own protection for six months and who has requested a transfer to another institution, the Assignment Committee shall recommend and the Transfer Coordinator shall seriously consider the transfer, subject to available space in the transferee institution and subject to the provisions of Administrative Regulation 819 and transfer directives."

■ In addition, the district court found that, *"based on the record before me, for the past year no serious harm has occurred to any Pontiac inmate in protective custody."* (emphasis added). At the evidentiary hearing, the court clarified this finding by stating that no serious harm had occurred to any protective custody inmate "since July of last year" and "[t]hat wouldn't be just the dining hall. *It would be through the whole institution."* (em-

phasis added). Further testimony at the evidentiary hearing revealed that Warden McGinnis, the present warden at Pontiac, began his administration in July 1982. Thus, during the entire tenure of the McGinnis administration, not one protective custody inmate at Pontiac had been seriously harmed.[5] In light of this finding along with the Illinois Department of Correction's adherence to the *Meeks v. Lane* consent decree and its promulgation of Administrative Regulation 808, it is clear that the plaintiffs failed to establish the four factors necessary to obtain a preliminary injunction.

With regard to the first factor, plaintiffs' reasonable likelihood of success on the merits, a review of the record reveals that the plaintiffs instituted this action against the officials of the Illinois Department of Corrections under 42 U.S.C. § 1983. The plaintiffs claimed, *inter alia,* that the defendants were violating their Eighth Amendment right to be free from cruel and unusual punishment. The plaintiffs based their claim upon an allegation that prison officials were allowing general population inmates access to the protective custody units, and thus inflicting cruel and unusual punishment upon the plaintiffs. The testimony at the evidentiary hearing revealed, however, that the defendants were, in fact, operating the protective custody units at Pontiac under the *Meeks v. Lane* consent decree, issued in July 1981, and that the defendants had, in fact, promulgated Ill. Adm.Reg. 808 in June 1982, detailing the requirements and procedures to be followed in establishing protective custody units in maximum security prisons.

---

5. As previously noted, the district court did find that "[o]n occasion *assaults* of protective custody inmates by general population inmates have occurred during or in dining hall movements and also during commissary movements of the protective custody inmates." (emphasis added). The impact of this finding is substantially reduced, however, when one reviews the court's response to the defendants' suggestion that the phrase "serious harm," as used in the finding that "no serious harm has occurred to any Pontiac inmate in protective custody" be replaced with the phrase "assault." The court responded:

"You know, I stayed away from the word assault just because it is such a term of art and it seemed more significant to me to say, 'No serious harm has occurred to any inmate.' My common sense tells me that threats and verbal abuse are—they occur all the time." This discussion clearly reveals that the district court considered threats and verbal abuses to be assaults, and thus the finding that protective custody inmates were, on occasion, assaulted is, at best, ambiguous.

Though Pontiac's overall implementation of the protective custody unit plan may not have yet been perfected, the district court was required to view the "totality of the conditions of confinement" in determining if the plaintiffs had a reasonable likelihood of succeeding on their claim of cruel and unusual punishment. *Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983); *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir.1981). A review of the "totality of the conditions" at Pontiac reveals that prison officials placed approximately ⅙ of the prison population, including the plaintiffs and some 250 other inmates who were in fear of their safety and well-being, in protective custody units.[6] During the entire tenure of the McGinnis administration, not one of these protective custody inmates has been seriously harmed.

Moreover, according to the United States Supreme Court in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974):

> "*Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of these reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.* Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities."

416 U.S. at 404–05, 94 S.Ct. at 1807 (footnote omitted) (emphasis added). *See also Preston v. Thompson*, 589 F.2d 300, 305

(7th Cir.1978) (Pell, J., dissenting in part, concurring in part). In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court added that:

> "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. *Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.* 'Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.'"

441 U.S. at 547–48, 99 S.Ct. at 1878–79 (citations omitted) (footnote omitted) (emphasis added). Finally, in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court stated that, "courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system ...." 452 U.S. at 352, 101 S.Ct. at 2402.

In the instant case, the record clearly reveals that officials of the Illinois Department of Corrections are aware of the protective custody inmates' needs, and have promulgated Ill.Adm.Reg. 808 "[t]o provide at each maximum security institution a protective area for committed persons whose safety and security may be threatened in the general population ...." Based upon the well-defined principles of Federal law that cruel and unusual punishment is determined upon a view of the totality of the circumstances and that the administration of state penal institutions is generally a matter for the "expertise, comprehensive

---

**6.** Based upon the district court's findings of fact that Pontiac houses 1200 inmates in the general population and between 250 and 270 inmates in protective custody units, the protective custody inmates comprise approximately ⅙ (17%) of the total prison population at Pontiac.

planning, and the commitment of resources, ... peculiarly within the province of the legislative and executive branches of government," *Procunier v. Martinez*, 416 U.S. at 405, 94 S.Ct. at 1807, there is no reasonable likelihood that the plaintiffs will succeed on the merits.

Furthermore, in light of the fact that not one protective custody inmate in the entire Pontiac prison has been seriously harmed during the McGinnis administration, beginning in July 1982, the record is void of a cognizable threatened injury to the plaintiffs, aside from the inherent risks of prison existence. As this court noted in *United States ex rel. Miller v. Twomey*, 479 F.2d 701 (7th Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974), "the possibility of widespread violence is a continuous condition of prison life." 479 F.2d at 717. *See also Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981) (a prison setting is tense and potentially dangerous). The Supreme Court has added that "[t]o the extent that [prison] conditions are restrictive and even harsh, they are a part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. at 347, 101 S.Ct. at 2399. Indeed, the district court stated at the evidentiary hearing that, "there is no way any human being could guarantee, guarantee the safety of anybody in that institution—correctional officer or inmate." Accordingly, with regard to the third factor, the inherent risks of prison existence must be balanced against the threatened harm that the district court's preliminary injunction would cause the defendant.

In the preliminary injunction of July 28, 1983, later modified by the October 21 order, the district court ordered the prison to implement policies not expressly provided for in Ill.Adm.Reg. 808 or the *Meeks v. Lane* consent decree. These policies include the maintenance of twenty-foot barriers between the general population inmates and the protective custody inmates, the requirement of additional man-hours in the west cellhouse watch tower, and the implementation of a screening program to review general population inmates before they enter the protective custody units. The record is absolutely void of any evidence that these judicially mandated policies would be in the best interest of the prison or that they would, in fact, add to the overall security of protective custody unit inmates. Moreover, the Supreme Court has recognized that "[t]he operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935 (1974). In the instant case, officials of the Illinois Department of Corrections operate the Pontiac protective custody units under the *Meeks v. Lane* consent decree and follow the procedures set forth in Ill.Adm.Reg. 808. In light of this evidence, the district court's further restrictive policies of twenty-foot barriers, additional man-hours in the west cellhouse, and screening programs, places an undue burden upon prison officials at Pontiac who must already cope with the almost insurmountable problem of an increasing and complex prison population. This undue burden, in view of the fact that not one protective custody inmate at the entire Pontiac prison has been seriously harmed during the McGinnis administration, clearly outweighs any threatened injury to the plaintiffs.

■ Finally, the undue burden that the district court's preliminary injunction would cause the Illinois Department of Corrections clearly disserves the public interest. "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody." *Procunier v. Martinez*, 416 U.S. at 404, 94 S.Ct. at 1807. Prison administrators are specially trained and duly compensated by the public to handle the daily operation and maintenance of maximum security prisons. Absent a clear constitutional violation, courts should be hesitant to impose their theories

of prison reform. In contrast to the vast majority of Federal judges, prison administrators possess a wealth of penological expertise and experience that qualifies them to supervise, discipline, and rehabilitate inmates within an ever-changing, complex prison system. Judicial deference is accorded their decisions "not merely because the administrator will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive branches of our Government, not the Judicial." *Bell v. Wolfish*, 441 U.S. at 548, 99 S.Ct. at 1879. In the instant case, the Illinois state legislature has determined that the Department of Corrections shall "maintain and administer all State correctional institutions and facilities under its control . . . ." Ill.Rev. Stat. ch. 38 § 1003–2–2(c) (1983). Thus, the district court's interference in the daily operation and maintenance of the Pontiac maximum security prison conflicts with Illinois law and, in turn, the interests of Illinois citizens.

The district court's attempt to provide additional security for the protective custody inmates at Pontiac goes far beyond the scope of a preliminary injunction. *See, e.g., Jones v. Franzen*, 697 F.2d 801, 804 (7th Cir.1983). Based upon the testimony elicited at the evidentiary hearing and the district court's findings of fact, the plaintiffs have no reasonable likelihood of success on the merits, the threatened harm to the plaintiffs does not outweigh the harm a preliminary injunction will cause the defendants, and a preliminary injunction will most assuredly do a disservice to the general public. In light of the fact that the Illinois Department of Corrections operates the Pontiac prison under the *Meeks v. Lane* consent decree, has promulgated Ill.Adm. Reg. 808 to further provide for the safety of protective custody inmates, and has had no incident of serious harm occurring to any protective custody inmate at Pontiac during the entire tenure of the McGinnis administration, we hold that the district court's entry of a preliminary injunction

and later modification of the terms of that injunction, constitute an abuse of discretion.

### III

We reverse the October 21, 1983 order of the district court, modifying the original preliminary injunction, and remand this case for a hearing on the permanent injunction.