7 F.3d 332
 129 A.L.R.Fed. 745, 86 Ed. Law Rep. 631
 Dawn FAVIA; Wendy Schadelmeier; Kim Dalcamo; Amy
Phaelhler, on behalf of themselves and all
similarly situated individuals, Appellees,
v.
INDIANA UNIVERSITY OF PENNSYLVANIA; Lawrence Pettit; Frank
Cignetti, Appellants.
 No. 93-3051.
 United States Court of Appeals,
Third Circuit.
 Argued May 12, 1993.
Decided Oct. 13, 1993.
 
 Ernest D. Preate, Jr., Atty. Gen., Donna J. McClelland (argued), Deputy Atty. Gen., Kate L. Mershimer, Sr. Deputy Atty. Gen., and John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen. of Pennsylvania, Pittsburgh, PA, for appellants.
 Jon Pushinsky (argued), Edward A. Olds, Michael Louik, Berger, Kapetan, Meyers, Rosen, Louik & Raizman, P.C., Pittsburgh, PA, and Arthur H. Bryant and Anne W. Bloom, Trial Lawyers for Public Justice, P.C., Washington, DC, for appellees.
 PRESENT: BECKER, HUTCHINSON and ROTH, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellants, Indiana University of Pennsylvania ("I.U.P" or the "University"), I.U.P. Director of Athletics Frank Cignetti, and I.U.P. President Lawrence Pettit[1] appeal an order of the United States District Court for the Western District of Pennsylvania denying their motion to modify a preliminary injunction. The injunction requires them to reinstate two varsity women's sports programs, field hockey and gymnastics. It resulted from a class action filed by appellees, Dawn Favia, Wendy Schandelmeier, Kim Dalcamo, and Amy Phaehler,[2] members of the University women's varsity field hockey and gymnastics teams. They claimed that the University's planned elimination of those intercollegiate women's programs violated Title IX of the Education Amendments of 1972, 20 U.S.C.A. §§ 1681-1688 (West 1990).[3] I.U.P. sought the modification to allow it to replace the women's gymnastics program with a women's soccer program. It claimed the substitution of soccer for gymnastics would bring it closer to compliance with Title IX and therefore the district court erred in denying its motion to modify the preliminary injunction.[4]
 
 
 2
 The district court held I.U.P. had not shown the circumstances had changed enough to make continued enforcement of the injunction inequitable. After examining the record and considering the parties' contentions, we hold that the district court did not abuse its discretion in denying modification of the preliminary injunction. We will therefore affirm.
 
 I.
 
 3
 I.U.P. is a state-affiliated university located in Indiana, Pennsylvania. It has 6,003 full-time undergraduate female students (55.6% of the population) and 4,790 male students (44.4% of the population). Prior to the institution of this action, I.U.P. fielded nine male and nine female varsity athletic teams in intercollegiate competition. The number of teams was equal, but the male teams were significantly larger. Thus, 313 men but only 190 women, a 62% to 38% ratio, had an opportunity to compete in intercollegiate athletics. There was also a disparity in athletic scholarships. In 1991, I.U.P. awarded only 21% of its athletic scholarship funds to women, and for each $8.00 spent on men's athletics it spent only $2.75 on women's athletics.
 
 
 4
 In mid-1991, citing budgetary concerns, I.U.P. decided to shrink the size of its athletic department. It announced plans to discontinue four varsity athletic programs, the men's tennis and soccer teams and the women's gymnastics and field hockey teams.
 
 
 5
 On October 5, 1992, three student gymnasts, Dawn Favia, Wendy Schandelmeier, and Kim Dalcamo, and one member of the women's varsity field hockey team, Amy Phaehler, filed a class action lawsuit in the United States District Court for the Western District of Pennsylvania. They were seeking a decree that would force the University to comply with Title IX and eliminate the disparity between its men's and women's intercollegiate sports programs. They also asked for a preliminary injunction ordering I.U.P. to reinstate the women's gymnastics and field hockey teams. They alleged that the University's failure to provide athletic opportunities for women at a level comparable to those provided for men violated Title IX and adversely affected all female students who might wish to take part in intercollegiate athletics. They described the affected class as all present and future women students at I.U.P. who participate, seek to participate, or are deterred from participating in intercollegiate athletics at the University.
 
 
 6
 On October 21-23, 1992, the district court held a hearing on the preliminary injunction. A number of witnesses were called and testified. Dr. David DeCoster, I.U.P.'s Vice-President of Student Affairs, stated that the women's field hockey and gymnastics teams were selected for elimination because of a national trend showing declining participation in those sports. Dr. Vivian Fuller, former associate director of intercollegiate athletics and senior women's administrator, and Mr. Frank Cignetti, athletic director, both testified that I.U.P. already had plans in place to elevate soccer from its current club status to a varsity sport for women as soon as it became financially able. Cignetti also stated that gymnastics was expensive and not conducive to an efficient use of athletic facilities.
 
 
 7
 Although I.U.P. eliminated an equal number of men's and women's teams, the evidence presented showed that it actually increased the imbalance between individual opportunities for men and women in percentage terms. In addition, most of the financial savings from the team eliminations were shown to have resulted from elimination of the women's teams. Their demise saved I.U.P. $110,000.00. Cutbacks in the men's teams saved only $35,000.00.
 
 
 8
 On November 2, 1992, after the hearing on the preliminary injunction, the district court determined that I.U.P. did not meet any prong of the three-part regulatory test for compliance with Title IX's requirement of balanced participation.[5] Accordingly, it held that I.U.P. had failed to provide equal athletic opportunities to female students and was in violation of Title IX. The district court therefore granted preliminary injunctive relief and ordered I.U.P. to reinstate the women's gymnastics and field hockey programs and simultaneously certified the class. I.U.P. did not appeal the grant of preliminary injunctive relief or file a motion for reconsideration with the district court within ten days as required by Federal Rule of Civil Procedure 59(e).[6]
 
 
 9
 On January 7, 1993, I.U.P. filed a motion to modify the preliminary injunction. It sought to replace the gymnastics team with a women's soccer team. I.U.P. argued that the inclusion of a women's soccer team would further the goals of Title IX by creating more opportunities for women while saving the athletic department money which could then be used to finance recruitment of additional female athletes.
 
 
 10
 On January 22, 1993, the district court held a hearing on the motion to modify the preliminary injunction. Athletic Director Cignetti testified that substitution of a women's soccer team for the gymnastics team would increase the percentage of females participating in athletics from the current 39% to 43%. Cignetti also testified that the University believed soccer would better reduce the imbalance between male and female athletic opportunities than field hockey and gymnastics, and would also be in line with the national trend toward female participation in soccer and away from gymnastics. The record contains evidence that only two of the current gymnastics team members will return next year because the others are either graduating or not participating.[7] On the other hand, approximately 30-35 women currently attending the University have expressed an interest in soccer. In addition, the University showed that the establishment of a soccer team in place of the gymnastics team would permit more productive use of I.U.P.'s gym facilities because gymnastics required these facilities to be dedicated solely to that sport during its season. According to Cignetti, the plaintiff class of female I.U.P. students would be better served if the gymnastics team were replaced by a soccer team.
 
 
 11
 The district court denied the motion to modify the preliminary injunction on January 22, 1993. It reasoned if it were to permit the school to dissolve the gymnastics team it would in effect make "the original plaintiffs [who prevailed] in this case losers." Appellants' Appendix ("App.") at 167. The substitution of teams "would really amount to vacating an order and putting in something entirely different." Id. Essentially, the district court looked at I.U.P.'s motion as a belated request for reconsideration of a preliminary injunction that had not been timely appealed.
 
 
 12
 On February 3, 1993, I.U.P. did file a timely notice of appeal from the district court's order denying modification of the preliminary injunction.
 
 II.
 
 13
 The district court had subject matter jurisdiction over this case under 28 U.S.C.A. § 1331 (West 1966) and 28 U.S.C.A. § 1343(a) (West Supp.1993). Appellees, the named representative plaintiffs and the class they represent, dispute our appellate jurisdiction. They argue that I.U.P.'s "Motion to Modify the Preliminary Injunction" was an untimely motion for reconsideration of the grant of a preliminary injunction whose denial is no longer appealable or subject to appellate review.
 
 
 14
 This Court retains appellate jurisdiction over all "[i]nterlocutory orders of the district courts ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C.A. § 1292(a)(1) (West Supp.1993); see Cohen v. Board of Trustees, 867 F.2d 1455, 1464 n. 7 (3d Cir.1989). The class argues that I.U.P.'s motion did not seek to modify the injunction but merely to relitigate the underlying issue, and therefore it should be treated as a motion for reconsideration under Federal Rule of Civil Procedure 59(e). See Ortho Pharmaceutical Corp. v. Amgen, Inc., 887 F.2d 460, 463 (3d Cir.1989). A Rule 59(e) motion must be filed within ten days of the entry of judgment. See Fed.R.Civ.P. 59(e). Accordingly, if I.U.P.'s "Motion to Modify Preliminary Injunction" is properly a Rule 59(e) motion for reconsideration, it would be untimely because the judgment in the underlying action was entered on November 2, 1992, more than two months prior to I.U.P.'s motion, and the district court as well as this Court would be unable to consider the merits of the order it questions.
 
 
 15
 In order to determine whether I.U.P.'s motion is properly one for modification whose merits can be considered in this appeal, we must look beyond the motion's caption to its substance. See Ortho, 887 F.2d at 463; see also Merrell-Nat'l Lab., Inc. v. Zenith Lab., Inc., 579 F.2d 786, 791 (3d Cir.1978). In Ortho we stated, "Certainly, absent some change in circumstances, a movant ought not to be able to file a motion under the aegis of Fed.R.Civ.P. 62(c) [pertaining to the modification of an injunction] and relitigate the 'original issue' simply because the case involves preliminary injunctive relief." Ortho, 887 F.2d at 463. Modification of an injunction is proper only when there has been a change of circumstances between entry of the injunction and the filing of the motion that would render the continuance of the injunction in its original form inequitable. See Merrell-Nat'l Lab., 579 F.2d at 791.
 
 
 16
 In Ortho we compared the circumstances present on the date the injunction was entered with the circumstances alleged in the subsequent motion. See Ortho, 887 F.2d at 462-63. Here too, to decide whether the "Motion to Modify Preliminary Injunction" is merely an untimely Rule 59(e) motion for reconsideration disguised as a motion to modify, we compare the circumstances existing on November 2, 1992, the date of entry of the order granting the preliminary injunction, with the circumstances existing when the motion to modify was made. As we noted in Ortho, an order granting a preliminary injunction is not indefinitely open to challenge. Id.; see also Merrell-Nat'l Lab., 579 F.2d at 791.[8] When a district court enters an order granting preliminary injunctive relief, parties who take exception to its terms must either file a motion for reconsideration in the district court within ten days under Rule 59(e), bring an interlocutory appeal from that order under 28 U.S.C.A. § 1292(a)(1), or wait until the preliminary injunction becomes final and then appeal. I.U.P. did not appeal the entry of the preliminary injunction. Instead, it waited two months and filed what it called a motion to modify.
 
 
 17
 The University argues that two circumstances have changed since the hearing on the preliminary injunction and that they warrant its modification. First, it contends that the posture of the case changed on the date of the entry of the injunction when the district court, without the benefit of evidence or argument, certified the class. I.U.P. says that certification of the class changes the entire complexion of the case and requires the district court to reassess the remedial effect of the injunction. Second, it asserts that graduation of the class representatives, the original named plaintiffs who originally wanted to take part in inter-collegiate gymnastics, is a change in circumstances warranting modification.
 
 
 18
 Whatever change the class certification effected occurred on the date the injunction was entered because, in the order granting the injunction, the district court also certified the class. We will not review "any aspects of the present case other than those which developed subsequent to the granting of the preliminary injunction." Fern v. Thorp Pub. Sch., 532 F.2d 1120, 1128 (7th Cir.1976). I.U.P. had every opportunity to file a Rule 59(e) motion or appeal the entry of the injunction given the disposition of the class issue. It chose not to do so. This element of the order, though itself not immediately appealable,[9] is not a "change in circumstances" that gives the challenging party an unlimited period of time in which to dispute the initial injunction. To give it that effect would undermine Rule 59(e)'s policy of promoting finality. A motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order. The primary justification for granting a motion to modify is to avoid the injustice of requiring a defendant to continue complying with an injunctive order under circumstances that would have prevented its entry in the first place. Here, the class certification is not such a change. It occurred at the same time the injunction was entered. The plaintiffs had requested class relief in their complaint, and the University was faced with the class's certification from the moment the injunction was entered but failed to appeal. See Merrell-Nat'l Lab., 579 F.2d at 791-92 (new "facts" that were available at the time of the entry of the injunction do not constitute circumstances sufficient to modify injunction).[10] The certification of the class is not a change in circumstances that occurred after entry of the preliminary injunction.[11] Therefore, we have no basis for interfering with the district court's order denying modification on that basis.
 
 
 19
 Since the entry of the injunction, two of the four class representatives, Dawn Favia and Kim Dalcamo, members of the gymnastics team, have completed competition for the year and have graduated. A third class representative, Wendy Schandelmeier, decided not to compete with the gymnastics team once it was reinstated.[12] Therefore, I.U.P. also asserts that the ineligibility of the class representatives for further intercollegiate competition in gymnastics is a "change in circumstances" that permits favorable consideration of its motion to modify the preliminary injunction.
 
 
 20
 A change in the status of a plaintiff in a Title IX action can have drastic effects on the outcome. In Cook v. Colgate University, 992 F.2d 17 (2d Cir.1993), five members of the Colgate University women's ice hockey team sought elevation to varsity status and funding commensurate with the men's program. The district court granted the relief and the university appealed. Cook v. Colgate Univ., 802 F.Supp. 737 (N.D.N.Y.1992), rev'd, 992 F.2d 17 (2d Cir.1993). During the pendency of the appeal, the remaining active plaintiffs graduated leaving no plaintiff on the team. The United States Court of Appeals for the Second Circuit vacated the district court's order and dismissed the complaint as moot reasoning that none of the remaining plaintiffs could benefit from the order. Cook, 992 F.2d at 20. In Cook, the action was not certified as a class action. In holding the case was moot, the court of appeals stated that the circumstances before it were different from those that confronted the United States Court of Appeals for the First Circuit in Cohen v. Brown University, 991 F.2d 888 (1st Cir.1993) where the case had been certified as a class action. Id.
 
 
 21
 In this case, although the district court certified the class, the principles it considered in reaching its decision and fashioning preliminary relief related directly to the fact that the named plaintiffs, or class representatives, were members of the women's gymnastics team. An alleged change in the composition of that squad or the demand for that program, if proven, could amount to a change in circumstances sufficient to receive modification of an injunction.
 
 
 22
 The change in the eligibility of the class representatives for participation in gymnastics does change the circumstances that caused the district court to fashion its preliminary injunctive relief. The University therefore has alleged one change in circumstances that allows us to consider its motion as a motion for modification of the injunction rather than a motion for reconsideration.
 
 
 23
 Furthermore, an important independent question is at stake in the present motion to modify the injunction. That issue is whether the class as it is now comprised is in a posture to challenge successfully the University's request to modify the injunction by eliminating women's gymnastics and substituting soccer. The issue before the district court when it held the hearing on the named plaintiffs' motion for a preliminary injunction concerned the University's decision to eliminate two women's sports programs in the face of an apparent violation of Title IX. In its motion to modify, I.U.P. says it wants to restructure its program to bring it closer to the equal opportunity goal that Title IX requires. In that sense, I.U.P.'s motion presents issues that could not have been raised on appeal or through a request for reconsideration of the preliminary injunction itself.
 
 
 24
 Thus, we have appellate jurisdiction over the order of the district court denying the University's motion for modification pursuant to 28 U.S.C.A. § 1292(a)(1),[13] and we are not precluded from considering its merits. Our scope of review over that order is nevertheless quite limited. We review orders denying motions for modification of an injunction only for abuse of discretion. Merrell-Nat'l Lab., 579 F.2d at 791-92. We have described an abuse of discretion as a decision that is "arbitrary, capricious or irrational or employs improper standards, criteria or procedures." Pennsylvania v. Local Union 542, 807 F.2d 330 (3d Cir.1986). Factual determinations subsidiary to the district court's conclusion are of course reviewed for clear error. Merrell-Nat'l Lab., 579 F.2d at 792.
 
 III.
 
 25
 Thus, turning to the merits, we consider whether the district court abused its discretion in holding the circumstances that led to the entry of a preliminary injunction against I.U.P. had not changed enough to require its modification. "When modifying a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place." Sierra Club v. Army Corps of Eng'rs, 732 F.2d 253, 256 (2d Cir.1984); see also 11 Wright & Miller, § 2961, at 600 ("wide discretion") (quoting System Fed'n No. 91 v. Wright, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)).
 
 
 26
 In order to prevail on a motion to modify, the movant must establish a change in circumstances that would make the original preliminary injunction inequitable:
 
 
 27
 The purpose of the motion to modify an injunction is to demonstrate that changed circumstances make the continuation of the order inequitable. The motion does not force the trial judge to permit relitigation of his original determination of the injunction and should not serve as an avenue of untimely review of that determination.
 
 
 28
 Merrell-Nat'l Lab., 579 F.2d at 791 (citations omitted). Accordingly, we inquire whether the circumstances of the underlying action have changed sufficiently so that continuation of the order, as originally entered, would be inequitable. Only then would the district court's refusal to modify the injunction as I.U.P. requests be an abuse of discretion. Because it had the opportunity to challenge the district court's determination that the plaintiff class was likely to succeed on the merits of its Title IX claim by appealing the preliminary injunction but elected not to do so, I.U.P. cannot relitigate the issue of program compliance on this appeal. Instead, we must focus our inquiry on the circumstances that led to the entry of the injunction and compare them with current circumstances for the purpose of deciding whether continuation of the injunction without the requested modification would be so inequitable that the district court's refusal to grant the motion to modify is reversible error.
 
 
 29
 The nature and extent of the burden borne by a party seeking modification of an injunction in a particular case is not entirely clear. In United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932), the Supreme Court stated a party seeking to modify any order or decree should make "a clear showing of grievous wrong evoked by new and unforseen conditions." Whether a wrong is grievous is decided on the basis of the harm the restrained party will suffer if there is no modification. See 11 Wright & Miller § 2961, at 601. Modification becomes appropriate when the changed circumstances turn the decree into "an instrument of wrong." Swift, 286 U.S. at 115, 52 S.Ct. at 462. The Supreme Court again considered the Swift standard in United States v. United Shoe Machine Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). In United Shoe it stated that a decree should not be changed if its remedial purposes have not been fully achieved. There, the Supreme Court focused on whether there is a continuing need for the injunction in light of the changed circumstance. Id. at 248, 88 S.Ct. at 1499. In United Shoe, however, it was a plaintiff who attempted to modify an injunction to increase the burden on the defendant. Recently, in Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court refused to apply Swift's test of a "grievous wrong" to the institutional reform of a prison. The defendant-petitioners in Rufo had sought to modify a consent decree that required the construction of a new jail.[14] The Court held the use of equitable power to accomplish institutional reform requires a more flexible approach than Swift allows. It pointed out that it did not intend "grievous wrong," the phrase used in Swift, to become a talisman. In contrast, Rufo held that a decree directing institutional reform could be modified upon the looser standard of showing a "significant change in facts or law" and that the proposed modification is "suitably tailored" to the changed circumstance. Id. at ----, ----, 112 S.Ct. at 758, 765. Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous, when the decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest. Id. at ----, 112 S.Ct. at 760 (citations omitted); see also Board of Educ. of Oklahoma City Pub. Sch. v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (rejecting rigid use of Swift "grievous wrong" language as barrier to school district's motion to dissolve desegregation decree). In United States v. Local 560, 974 F.2d 315, 331-32 (3d Cir.1992), a post-Rufo decision concerning a plaintiff's motion for modification, we used the United Shoe standard of whether the purposes of the original injunction were not being fulfilled. In Local 560, we noted, however:
 
 
 30
 In the obverse situation, where a defendant requests modification of an injunctive decree entered against him or her, the court may modify the injunction if (1) there are changes in the operative facts, (2) there are changes in the relevant decisional law and (3) there are changes in the applicable statutory law.
 
 
 31
 Id. at 331 n. 9 (dicta).
 
 
 32
 Before Rufo, this Court consistently used the Swift standard. See International Bhd. of Teamsters v. Western Pa. Motor Carriers Ass'n, 660 F.2d 76, 85 (3d Cir.1981) (citing Swift, 286 U.S. at 119, 52 S.Ct. at 464); see also United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1088 (3d Cir.1987) (applying Swift to amendment of consent decree); Bolden III v. Pennsylvania State Police, 578 F.2d 912, 920 (3d Cir.1978) (implying Swift still applicable to modification of injunction); cf. Local 560, 974 F.2d at 331 n. 9. Nevertheless, because this case involves institutional reform,[15] Rufo controls and its more flexible standard of inequity applies.[16]
 
 
 33
 In directing the University to reinstate the gymnastics program in the preliminary injunction, the district court necessarily decided that the student-athletes were likely to succeed on the merits of their claim that I.U.P. was violating Title IX and that continuing the gymnastics program would help alleviate that violation. The University does not contend that the addition of a soccer program would bring I.U.P. into full compliance with the mandates of Title IX and, indeed, we do not see how it could do so; however, it does seem that the addition of a soccer program would bring it closer to compliance.[17] By substituting soccer for gymnastics, women's participation in athletics would increase from 159 female athletes (38.97% of the student-athlete population) to 188 female athletes (43.02% of the student-athlete population). In addition, there was testimony that I.U.P.'s proposed enhanced recruiting efforts, using funds that would become available from elimination of the gymnastics program, would be expected to raise the number of female athletes within three to five years to a level which would be closely proportional to the percentage of women enrolled at I.U.P.
 
 
 34
 Nevertheless, two things militate strongly against a conclusion that the district court abused its discretion. First, the district court did not clearly abuse its discretion by seeking to preserve the athletic program that was at the center of the underlying litigation. A preliminary injunction is intended "to preserve the relative positions of the parties until a trial on the merits can be held." University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned. Id.; Opticians Assoc. of Am. v. Independent Opticians of Am., 920 F.2d 187, 197 (3d Cir.1990) (citation omitted). But see Ortho, 887 F.2d at 464 (modification may be necessary to preserve appeal even if it alters status quo).
 
 
 35
 We have already decided I.U.P.'s argument that the district court certification of the plaintiff class as part of its order granting preliminary injunctive relief is not a changed circumstance. On the merits, therefore, we review its second asserted changed circumstance--the class representatives' altered competitive posture because of their graduation or failure to participate in the challenged athletic programs--only to determine whether continuation of the preliminary injunction without the modification it requires will result in significant inequity either to the University or the members of the plaintiff class.[18]
 
 
 36
 Although the University correctly points out that the named representatives' interests are no longer at issue, women's gymnastics is still part of the athletic opportunities available to the class of plaintiffs who seek redress. In entering the preliminary injunction, the district court originally determined that reinstatement of the gymnastics team addressed, in part, a likely violation of federal law that affected the plaintiffs as a class, though to differing degrees as individuals. The absence of some individual gymnasts does not show that it is inappropriate to continue to try to maintain the status quo. There is testimony in the record that women presently attending, or planning to attend, I.U.P. are still interested in participating in a gymnastics program.
 
 
 37
 Secondly, it is not clear that the University's proposed substitution of soccer for gymnastics will substantially ameliorate what the district court decided was likely to be a violation of Title IX.[19] Although Title IX and its regulations do not "require institutions to expend equal amounts of money on members of each sex[,]" Cohen v. Brown University, 809 F.Supp. 978, 994, (D.R.I. 1992), aff'd, 991 F.2d 888 (1st Cir.1993), funding is at least an element in deciding whether the equality of opportunity Title IX requires is present. Regulations the Secretary of Health, Education and Welfare ("HEW") promulgated, now administered by the Department of Education, pursuant to Title IX provide, inter alia, that unequal aggregate expenditures for members of male and female teams will not necessarily establish noncompliance, but the failure to provide funds for teams of one sex may be considered in assessing equality of opportunity for members of each sex. 34 C.F.R. § 106.41(c) (1992);[20] see 44 Fed.Reg. 71,413, 71,415-17 (1979) (HEW Title IX Intercollegiate Athletics Policy Interpretation describing three major areas of regulatory compliance to include athletic financial assistance, equivalence in other benefits and opportunities, accommodation of student interests); see also Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 828 (10th Cir.1993); Brown, 809 F.Supp. at 994; Cook, 802 F.Supp. at 744-45. Under the regulations and the case law, many of the factors used to determine compliance depend on criteria directly related to funding levels, e.g., provision of equipment, travel and per diem allowances, compensation of coaches and provision of facilities.
 
 
 38
 Although replacement of the gymnastics program with soccer could increase the percentage of female athletes from 38.97% to 43.02%, it would decrease the overall percentage of athletic expenditures I.U.P. provided for women's athletics because a fifteen member gymnastics team requires a $150,000.00 investment while a fifty member soccer team requires only $50,000.00.[21] Although more slots for female competition might be created, the funding gap would increase and this result could be viewed as moving I.U.P. farther from the goals of Title IX.
 
 
 39
 Even if the funding issue is put aside, I.U.P. would still appear not to be in Title IX compliance in other aspects because its student body has 6,003 females (56%) and 4,790 males (44%).[22] See Brown, 991 F.2d at 899 (in absence of continuing program expansion, schools must either provide athletic opportunities in proportion to gender composition of student body or fully accommodate interested athletes among under-represented sex). I.U.P. did not have a specific overall plan in place to achieve total compliance at any projected future date. See id. at 906 ("Title IX does not require institutions to fund any particular number or type of athletic opportunity--only that they provide those opportunities in a nondiscriminatory manner...."); see also Roberts, 998 F.2d at 833. The graduation of three members of the certified class along with a proposal to add a women's soccer team does not make the preliminary injunction inequitable, nor eliminate a continuing need for it.[23]
 
 
 40
 We also think the burden on I.U.P. in seeking modification is affected by the fact that we are reviewing a preliminary rather than a final injunction. By its very nature, a preliminary injunction will ultimately be reviewed again by the issuing authority, here the district court. I.U.P. must demonstrate that it will suffer significant inequity prior to entry of a final decree. For all these reasons, we hold, therefore, that the University has failed to meet its burden of demonstrating a "significant" change in facts, even under the less exacting, flexible Rufo test. Because the University will not suffer significant inequity, we hold that the district court did not abuse its discretion in refusing to modify the preliminary injunction.
 
 
 41
 Nevertheless, we again note our concern about the district court's narrow focus on the interests of the named representatives of the class, to the possible detriment of the class as a whole. When it refused to grant modification it said:
 
 
 42
 [B]y modifying the order in the manner that the Commonwealth wants me to modify it, would in effect make the original plaintiffs in this case losers, and that just strikes me as being a very unjust kind of a result when actually they won the case in the first instance.
 
 
 43
 App. at 167. Accordingly, we caution the district court against giving too much weight to the interests of the original named plaintiffs who have graduated or are no longer participating in intercollegiate athletics. As this case proceeds, it should be remembered that once a court certifies a class action, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the named representative]." Franks v. Bowman Transp. Co., 424 U.S. 747, 753, 96 S.Ct. 1251, 1259, 47 L.Ed.2d 444 (1976) (quoted Sosna v. Iowa, 419 U.S. 393, 399, 95 S.Ct. 553, 557, 42 L.Ed.2d 532 (1975)); see also Roberts, 998 F.2d at 833-34 (discussing different task facing court in Title IX class action as opposed to an action brought by individual plaintiffs). If final injunctive relief becomes appropriate, we think the district court should consider how violations of federal law, if any, it finally determines are present affect the entire class and fashion final relief accordingly.
 
 IV.
 
 44
 The order of the district court will be affirmed.
 
 
 
 [1]
 Although the appellants have been sued in their individual capacities, their interests are coextensive mutually with the interests of the University. Therefore, we will collectively refer to them as "I.U.P." or the "University."
 
 
 [2]
 The docket sheet and caption spell Wendy Schandelmeier's and Amy Phaehler's names incorrectly
 
 
 [3]
 Title IX implicitly grants a private right of action. See Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Title IX provides in pertinent part:
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....
 20 U.S.C.A. § 1681(a) (West 1990). This protection has been afforded to participation in "any interscholastic, intercollegiate, club or intramural athletics offered by a recipient." 34 C.F.R. § 106.41(a) (1992). The University does not contest that its athletics program falls within the purview of Title IX.
 
 
 [4]
 The named plaintiffs, in a motion to dismiss this appeal as moot, have advised this Court that I.U.P. has now unilaterally elevated women's soccer to varsity status for the school year commencing in the fall of 1993. We will deny that motion. I.U.P.'s addition of soccer does not settle the dispute over the University's proposal to substitute a women's varsity soccer team for the gymnastics program. In its request for modification, I.U.P. did not seek permission to create a women's soccer program, but instead asked leave to substitute a soccer program for the gymnastics program. I.U.P., in a response to the motion to dismiss this appeal as moot, states that it continues to seek permission to make such a substitution. Furthermore, the soccer program is still not fully operational
 
 
 [5]
 The three-part test the district court used to determine compliance is as follows:
 1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
 2) Where the numbers of one sex have been and are under-represented among intercollegiate athletics, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members of that sex; or
 3) Where the members of one sex are under-represented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.
 Appellants' Appendix ("App.") at 57 (quoting 44 Fed.Reg. 71,418 (Dec. 11, 1979)).
 
 
 [6]
 The district court's November 2, 1992 order provided that "the Court's Preliminary Injunction shall become a permanent injunction without further proceedings, unless the Court receives notice, by November 23, 1992, that a party wishes to introduce further evidence in support of its position." App. at 42. At the request of the defendants, the district court extended the deadline to February 1, 1993. Subsequently, in separate letters to the district court, both parties requested a further evidentiary hearing before the injunction would be made final. A hearing on the final injunction had not been scheduled as of the date of this opinion. Therefore, we will analyze the case under the law's standards for modifying a preliminary, not a final injunction
 
 
 [7]
 The plaintiffs dispute the inference that this shows a lack of interest in gymnastics. Although four of the six current gymnasts ended their final year of intercollegiate competition in the spring of 1993, the plaintiffs contend there may be other individuals interested in the gymnastics program who did not seek to compete because of the uncertainty surrounding continuation of the program. There is also testimony in the record that the gymnastics coach is continuing to receive recruitment letters from numerous prospective students. Although I.U.P.'s gymnastics team is a Division II program, it competes against many Division I schools and won two national championships
 
 
 [8]
 There is some tension between Ortho and Franklin Sewerage Auth. v. Middlesex County Utilities Authority, 787 F.2d 117, 120 (3d Cir.), cert. denied, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 57 (1986). Franklin seems to say we look only to the form and title of the motion to determine whether it is a motion to modify for changed circumstances. Franklin, 787 F.2d at 120. But Franklin cites with approval our earlier decision in Merrell-Nat'l Laboratories. Id. In that case, we said "a merely repetitive motion to redetermine an injunction might not be appealable," thereby suggesting that allegations of changed circumstances are necessary on the jurisdictional issue. Merrell-Nat'l Lab., 579 F.2d at 791 (citation omitted). In Ortho we required a showing of change in circumstances so that a party, by simply filing a motion styled as a motion to modify, could not relitigate the underlying decree. Ortho, 887 F.2d at 463. Ortho's holding is in accord with the statement in Merrell-Nat'l Laboratories. To avoid the problem noted in Merrell and faced in Ortho, we think we must examine the allegations of I.U.P.'s motion to see whether it alleges a change in circumstances that turns this appeal into a timely one from an order denying a request for modification rather than an untimely appeal from an order denying a preliminary injunction. Thus, our jurisdictional inquiry does not extend beyond the allegations of I.U.P.'s motion for the limited purpose of deciding whether it asserts the change of circumstances that is necessary to our appellate jurisdiction
 
 
 [9]
 While the class certification portion of the order itself is not final at this point, Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), it can be reviewed on appeal after the district court enters a final judgment on the merits. See Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1802 at 464-65 & n. 10 (1986) (hereinafter "Wright & Miller") (citing Walsh v. Detroit, 412 F.2d 226 (6th Cir.1969)); see also Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978) (28 U.S.C.A. § 1292(a)(1) cannot be used to allow immediate appeal from order denying class certification)
 
 
 [10]
 The district court did not take evidence or entertain argument regarding class certification or class-based relief. Thus, it was not until the district court granted class certification along with the injunction that I.U.P. could have raised the question whether the relief granted addressed the needs of the class rather than the individual plaintiffs. See Ameron, Inc. v. United States Army Corps of Eng'rs, 787 F.2d 875, 888 (3d Cir.1986) ("In the absence of a certified class action, [a plaintiff] was only entitled to relief for itself."). Furthermore, as I.U.P. argues, questions concerning class-based relief might not have been ripe for appellate review when the preliminary injunction was entered because no such relief was considered or possible when the preliminary injunction hearing was held. See Brief for Appellants at 23 n. 14. These lingering questions, however, would not have prevented I.U.P. from filing a motion for reconsideration before the district court
 
 
 [11]
 Accordingly, we do not reach or decide I.U.P.'s argument that certification of an action as a class action can be a changed circumstance because the district court's inclusion of the certification in its order granting a preliminary injunction makes it plain that it is not a changed circumstance in this case
 
 
 [12]
 The fourth class representative, Amy Phaehler, was a member of the field hockey team. I.U.P. does not seek to alter the field hockey team's continuing status as an athletic program in its motion for modification. See Brief for Appellants at 14 n. 7
 
 
 [13]
 Of course, the presence of appellate jurisdiction does not determine whether the motion has merit
 
 
 [14]
 A consent decree, like a permanent injunction, seeks to remedy a particular harm. A preliminary injunction has the added purpose of preserving the status quo until a final injunction hearing is held. See University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Therefore, we think any modification of a preliminary injunction must be undertaken with the injunction's purpose in mind
 
 
 [15]
 Although the Court in Rufo specifically limited its holding to the institutional reform setting, id. --- U.S. at ----, 112 S.Ct. at 764-65, one court has interpreted Rufo as a general rejection of the exacting Swift standard for a more equitable standard that gives greater flexibility to the district judge. See In re Hendrix, 986 F.2d 195, 198 (7th Cir.1993) (modification of bankruptcy discharge). Because this case involves institutional reform, we do not reach or decide the question the court of appeals faced in Hendrix, whether Rufo entirely displaces the more rigid Swift standard
 
 
 [16]
 Rufo, which involved a consent decree, has been criticized as a disincentive to settlement by consent decree because it makes the settlement the decree embodies too easy to modify. See The Supreme Court, 1991 Term--Leading Cases, 106 Harv.L.Rev. 289, 293-94 (1992). We have here a litigated matter to which the above criticism does not apply. Moreover, we believe the application of different standards to litigated decrees, consent decrees, decrees dealing with institutional reform, etc. could generate an undesirable complexity and uncertainty about the standard that an appellate court should apply in reviewing an order to grant or deny modification of an equitable decree. See Powell v. Coughlin, 1993 WL 328837, at * 7, n. 4, 1993 U.S.Dist. LEXIS 11752, at *13, n. 4 (S.D.N.Y. Aug. 25, 1993) (holding that the same standard applies to modification of consent decrees and litigated decrees)
 
 
 [17]
 As support for its argument, I.U.P. presented evidence that a soccer program would offer 30-35 women opportunities to participate in varsity athletics whereas the gymnastics team is comprised of less than 10 women. It also contended that a women's soccer team would be less expensive and free up facilities that could be better utilized
 
 
 [18]
 I.U.P. argues that Title IX assesses compliance on a programmatic rather than a sport-specific basis and that a court therefore cannot mandate which sports it must provide. We recognize Title IX regulations give the university some flexibility in attaining compliance; but, because this is an appeal from an order denying modification of a preliminary injunction, we do not reach the overall merits of I.U.P.'s Title IX violation nor express any opinion on what type of general plan will attain compliance nor what program changes may be needed to comply. The scope and method of attaining compliance must be left, in the first instance, to the district court in its consideration of the form a final injunction should take
 
 
 [19]
 A final decision on the merits of the plaintiffs' case is yet to be made
 
 
 [20]
 The regulations provide as follows:
 (c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:
 (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
 (2) The provision of equipment and supplies;
 (3) Scheduling of games and practice time;
 (4) Travel and per diem allowance;
 (5) Opportunity to receive coaching and academic tutoring;
 (6) Assignment and compensation of coaches and tutors;
 (7) Provision of locker rooms, practice and competitive facilities;
 (8) Provision of medical and training facilities and services;
 (9) Provision of housing and dining facilities and services;
 (10) Publicity.
 Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.
 
 
 [34]
 C.F.R. § 106.41(c) (1993)
 
 
 [21]
 I.U.P. alleges it would use this savings of $100,000.00 to enhance recruitment of women athletes, see Brief for Appellants at 7, but there is no affirmative obligation on its part to do so or a guarantee that it will in fact do so
 
 
 [22]
 I.U.P. does not allege that a soccer team would remedy the violation that brought about the preliminary injunction in the first place
 
 
 [23]
 Nothing in the order prevents I.U.P. from adding the soccer team and keeping gymnastics in order to bring itself closer to Title IX compliance. We hold only that the non-competitive status of three members of the gymnastics team does not render the continuation of that program so inequitable as to mandate relief prior to the entry of a final injunction